### VIRGINIA v. WEST VIRGINIA.

IN EQUITY.

No. 3, Original. Argued January 20, 23, 24, 25, 26, 1911.—Decided March 6, 1911.

A suit brought by one State against another, formed by its consent from its territory, to determine what proportion the latter should pay of indebtedness of the former at the time of separation, is a quasi-international controversy and should be considered in an untechnical spirit. In such a controversy there is no municipal code governing the matter and this court may be called on to adjust differences that cannot be dealt with by Congress or disposed of by the legislature of either State alone.

A State is superior to the forms that it may require of its citizens; and where a part of a State separates and is created into a new State, a contract can be created by the constitutive ordinance of the parent State followed by the creation of the contemplated State.

A provision of the constitution of a new State, which is not addressed solely to those who are to be subject to its provisions, but is intended to be understood by the parent State and by Congress as embodying a just term which conditions the parent's consent, amounts to a contract.

In this case, the ordinance of Virginia, the constitution of West Virginia, and the act of Congress admitting West Virginia into the Union, when taken together, establish a contract that West Virginia will pay her share of the debt of Virginia existing at the time of separation.

Where all expenditures for which the debt of a State is created have the ultimate good of the whole State in view, the whole State, and not the particular locality in which the improvements are made, should equally bear the burden; and so *held* in apportioning the debt of Virginia between that State and West Virginia, that the latter should bear its share of the debt so created.

Provisions in the constitution of one State which is a party to a contract with another State cannot be taken as the sole guide to determine obligations under the contract.

What is just and equitable under a contract between States is a judicial question within the competence of this tribunal to decide.

A State may, by suit in this court, enforce against another State a contract in the performance of which the honor and credit of the plaintiff State is concerned. *New Hampshire* v. *Louisiana*, 108 U. S. 76, distinguished.

The liability assumed by West Virginia to bear a fair proportion of the debt of Virginia is a deep-seated equity not discharged by the fact that the creditors of Virginia may have released that State from the obligation of the portion to be assumed by West Virginia as ultimately determined; and Virginia may maintain a suit in this court to determine the liability of West Virginia even if the proceeds are to be applied to those holding certificates on which Virginia is no longer liable.

In apportioning the debt of Virginia between that State and West Virginia, the court rejects other methods proposed and adopts the ratio determined by the master's estimated valuation of real and personal property of the two States at the date of separation.

The value of slaves is properly excluded from such valuation.

There are many elements to be considered in determining the liability for interest by a newly created State on its share of the debt of the parent State, and this court will, before passing on that question in a suit of this nature, afford the parties an opportunity to adjust it between themselves.

A suit between States to apportion debt is a quasi-international controversy involving the honor and constitutional obligation of great States, which have a temper superior to that of private litigants; and, when this court has decided enough, patriotism, fraternity of the Union and mutual consideration should bring the controversy to an end.

THE facts, which involve the adjustment between Virginia and West Virginia of the debt of Virginia at the time

of the formation of the State of West Virginia, are stated in the opinion.

*Mr. Samuel W. Williams,* Attorney General of Virginia, *Mr. William A. Anderson, Mr. Randolph Harrison* and *Mr. John B. Moon* for Virginia:

The insistance of Virginia has been, and is, that West Virginia should be charged with an equitable proportion of the debt, to be ascertained under the Wheeling ordinance ·construed so as not to defeat the expressed controlling purpose of its enactment, and qualified and ruled by the provisions of Article VIII of the West Virginia constitution, upon which the consent of the legislature of Virginia and of ·the Congress of the United States to the formation of the new State·was predicated.

Agreeably to the decision of this court in its opinion, delivered by the late Chief Justice, the view of Virginia is, and has been, that the ordinance and the provisions of the West Virginia constitution, should be read as being in *pari materia;* but that the constitutional provision, being the latest, must prevail, if, and whenever there is any conflict between them.

Under paragraph 1 of the master's report, the public debt of the Commonwealth of Virginia as of January 1, 1861, is ascertained to be $33,897,073.82. The only controverted questions which have arisen under this paragraph have been as to the inclusion of the bonds of the Commonwealth, held by her Sinking Fund Board, and her Literary Fund Board, as part of the public debt. Virginia withdraws her objections to the master's action in excluding these bonds from the amount of the public debt.

Under paragraph 2 of the master's report, "the extent and assessed valuation of the territory of Virginia and of West Virginia, June 20, 1863, and the population thereof, with and without slaves, separately," as ascertained and reported by the master, are acceptable to Virginia.

Under paragraph 3 of the master's report, he has reported "all expenditures made by the Commonwealth of Virginia within the territory now constituting the State of West Virginia, since any part of the debt was contracted."

This is one of the accounts which is called for under § 9 of the Wheeling ordinance. The only questions to be considered in determining whether any particular expenditure made during that period should be charged against West Virginia, are: First, Was it made by Virginia, and Second, Was the money expended in West Virginia? The expenditures made in West Virginia in the construction of the Covington & Ohio Railroad, amounting to $1,146,460.42, are allowed by the master, but this allowance is objected to by West Virginia on the ground that by reason of the public acts and transactions of Virginia and West Virginia, in reference to this railroad, Virginia has lost her right to have those expenditures charged against West Virginia.

The Wheeling ordinance prescribed the basis on which the proportion of the Virginia debt to be assumed by West Virginia was to be ascertained and vested in the new State the ownership of the portion of the Covington & Ohio Railroad located in Virginia, and there is nothing in the concurrent acts of the two States, in reference to the Covington & Ohio Railroad, which repeals or modifies the provisions of that ordinance.

The master rejected, as proper charges against West Virginia, all expenditures made by Virginia in West Virginia territory in the construction of works of internal improvement located in West Virginia, but built through the agency of joint stock companies.

The master erred in the rejection of those items of the account against West Virginia. Paragraph 3 of the decree, closely following the terms of the Wheeling ordinance, directs the master to ascertain and report "*all*

*expenditures* made by the Commonwealth of Virginia within the territory now constituting West Virginia." The ground relied on for excluding these items from the debit account against West Virginia is, because of the manner in which the expenditures were made; that is, because they were not made by the State directly, through her own officers or employés, but were made through the medium of joint stock companies. There is no such qualification of the expenditures which are to be charged, either in the decree or in the ordinance. The words "direct" or "indirect" are not found in either the decree or in the ordinance. No such classification is to be found in either the decree or in the ordinance.

The view which is here urged as to the expenditures of the Commonwealth in works of internal improvement constructed in West Virginia territory, and as to the classification of such of those expenditures as were made through the agency of joint stock companies, is the view heretofore consistently taken by the representatives of West Virginia most familiar with the subject. The construction of the Wheeling ordinance in respect to the expenditures made by Virginia, through the agency of joint stock companies in the territory of West Virginia and adopted by public officials of West Virginia, remained unchallenged for more than a generation, and until this case, when this new and forced construction is attempted to be placed upon the Wheeling ordinance. We submit that this construction is not warranted, and that there is no authority for the master, under the language of the decree, which requires a report of all expenditures, to classify expenditures as "direct" and "indirect."

The fourth paragraph of the decree directs the master to ascertain "such proportion of the ordinary expenses of the government of Virginia, since any of said debt was contracted, as was properly assignable to the counties which were created into the State of West Virginia on the

basis of the average total population of Virginia, with or
without slaves, as shown by the census of the United
States."

This inquiry is manifestly predicated upon the language
of the Wheeling ordinance, which provides that the new
State shall be charged with "a just proportion of the
ordinary expense of the state government, since any part
of the said debt was contracted."

Nor are the ordinary expenses of a state government
merely those which are necessary and regular in their oc-
currence, but quite as largely such as are usual, though
not periodical, and such as are appropriate though not
essential to the needs and aspirations of an enlightened
and progressive people, and as are lawful.

In a modern State, and particularly in a State of the
American Union, caring for, conserving and promoting
the economic and material, as well as the social, sanitary,
physical, intellectual and moral welfare of its people,
many expenditures which may not be regarded as strictly
governmental, and some which may not be absolutely
necessary, are proper, lawful, usual and ordinary.

Under the decree the master was directed to ascer-
tain and report "such proportion of the ordinary ex-
penses of the government of Virginia since any of the
debt was contracted, as was properly assignable to the
counties which were created into the State of West Vir-
ginia, on the basis of the fair estimated valuation of the
property, real and personal, by counties, of the State of
Virginia."

This paragraph is clearly in the alternative with the
last clause of paragraph 4. The land assessments in Vir-
ginia were made in 1856, seven years before June, 1863,
at which latter date at least four-fifths of the present
territory of Virginia and one-fifth of the present territory
of West Virginia had been ravaged and desolated by war,
so that the valuation in 1856 afforded no just measure of

value in 1863. The lands were assessed as of their cash value in 1856. The personal property in Virginia counties was assessed annually on the first of February of each year, as of its then value, in the currency which then constituted the medium of exchange and the standard of value. The currency in 1863, with reference to which, as a standard of value, all their transactions were conducted was the depreciated currency of the Confederate States. The market values of all property, real and personal, in Confederate Virginia, was, throughout 1863, fictitiously enhanced by reason of the depreciation of the currency in circulation in those regions, in which currency alone those values were measured. The uncontradicted evidence in the case shows that the depreciation in value extended not only to slaves, but to all personal property, and was at least fifty per cent as a minimum.

The sixth paragraph of the decree directs the master to ascertain all money paid into the treasury of the Commonwealth from the counties included within the State of West Virginia during the period prior to the admission of the latter State into the Union.

The defendant objects to the master's findings under this head because he fails to give West Virginia credit for certain items.

The master's findings upon these items is evidently justified by the facts, and is consistent with the language of the decree and of the Wheeling ordinance.

The amounts received by Virginia upon the accounts and items objected to by defendant, particularly the dividends upon bank stock, were in no sense money paid into the treasury of the Commonwealth from the counties included in the State of West Virginia. They were profits earned by Virginia's own money which she had invested in fiscal institutions, and not money paid to Virginia from West Virginian counties, within the meaning or within the reason of the sixth paragraph of the decree, or

of the ninth section of the Wheeling ordinance, on which that paragraph is based.

The seventh paragraph of the decree directs an account ascertaining "the amount and value of all money, property, stocks and credits which West Virginia received from the Commonwealth of Virginia, not embraced in any of the preceding items, and not including any property, stocks or credits which were obtained or acquired by the Commonwealth after the date of the organization of the restored government of Virginia, together with the nature and description thereof."

This direction of the decree was doubtless given in response to the provisions of §§ 1, 2 and 5 of the act of the Wheeling legislature passed February 3, 1863. There were large amounts of property, chiefly unappropriated, abandoned, and delinquent and forfeited lands to which the Commonwealth had title, which passed to the new State by the said act of the Wheeling legislature and with the value of which property West Virginia was chargeable by the terms of that act, upon such settlement as should be had between the two States.

It was found to be impracticable to obtain satisfactory evidence of the disposition which had been made by the new State of large quantities of land, delinquent and forfeited to the Commonwealth prior to June, 1863. So that the only charges made by Virginia under the seventh paragraph of the decree are for money and bank stocks actually received by West Virginia from Virginia, after the formation of the new State in 1863 and 1864.

West Virginia received from the Commonwealth amounts aggregating $170,771.46, as assented to and certified by the accountants of both parties, and is reported by the master at page 181 at his report. Under these circumstances it is difficult to understand upon what ground the master excluded these items amounting to $170,771.46, as to which the facts are unquestionable.

These sums of money were undoubtedly received by the new from the old State. At that time the officials of the restored government of Virginia were West Virginians. That government dominated by West Virginians and the new State of West Virginia could appropriate and take out of the treasury of the State of Virginia at Wheeling, whatever it chose, and it did undoubtedly receive from the restored government of Virginia $170,771.46 for which sum it is properly chargeable.

What should West Virginia pay? What is West Virginia's share of the debt?

There can be no question but that the provisions of Article 8, § 8 of the West Virginia constitution, the act of Virginia and the act of Congress created a compact, and that the provisions of the constitution constituted an essential stipulation and condition upon which the consent of the legislature of Virginia to the creation of the new State was predicated. The Congress of the United States would never have given its consent to the partition of Virginia, and the erection of the new State out of her domain, but for the fact that the new State had undertaken to assume an equitable proportion of the then existing debt of the Commonwealth of Virginia, and pay the same with interest thereon.

As to the liability of West Virginia for interest; the contract here considered was a Virginia contract. Under the law of Virginia as repeatedly adjudicated by her highest court, the interest is incident to the obligation, and whenever a debt is due the debtor is bound to pay interest unless relieved from this obligation by agreement. "The interest follows the principal as the shadow does the substance." The decisions of the highest court in West Virginia are in accord with the decisions of the Virginia courts. This rule is applied in Virginia to debts due by the Commonwealth. The framers of the Wheeling ordinance must be presumed to have drawn that instru-

ment with reference to the principle of equity and justice
which had then and long before that time been embodied
in the laws of Virginia by the repeated decisions of her
highest courts.

The language of the Wheeling ordinance is that "The
new State shall take upon herself a just proportion of the
public debt of the Commonwealth of Virginia, prior to the
first day of January, 1861," etc.

The debt of Virginia therein referred to was an interest-
bearing debt. It was evidenced by the bonds of the Com-
monwealth, all of which, by the express terms of the
obligations, bore interest, payable in the future.

The stipulation of West Virginia expressed in her con-
stitution and accepted and acted upon by Virginia, was
that West Virginia would pay the accruing interest on her
share of the debt, as it should accrue, and the principal
thereof within thirty-four years.

The claim of Virginia is that West Virginia is bound
both by the terms of the Wheeling ordinance and of her
first constitution to pay a just and equitable part of this
debt, with interest thereon until the same shall be fully
paid, and that she shall not be suffered to repudiate either
obligation.

*Mr. Holmes Conrad,* counsel for the bondholding cred-
itors, appearing as *amicus curiæ:*

Counsel for bondholders dissents from the views ex-
pressed in the briefs and arguments of the Attorneys Gen-
eral of Virginia and West Virginia, respectively, as to the
validity and application here of the ninth section of the
Wheeling ordinance.

1. The ninth section of the ordinance was not "the
basis upon which the consent of the Commonwealth of
Virginia was given to the formation of the new State."
Such ninth section was never, for one instant of time,
recognized by any convention or legislature as having

any binding force upon either State or person, and that as a proposition made by Virginia to West Virginia it was never accepted by the latter State.

2. The ninth section was not "a stipulation imposed by Virginia upon West Virginia as a condition upon which her consent was given and which was afterwards accepted and assented to by the people of West Virginia."

3. It was not "a contractual or a fundamental provision, and it did not constitute a primary obligation, or lie at the foundation of the right of West Virginia to be a State."

West Virginia became a State by being admitted into the Union by the Congress of the United States, upon the consent, first obtained, of the restored State of Virginia, and such consent, in its express terms, referred to the constitution framed for West Virginia, and did not by expression or implication refer to the ordinance or to any of its provisions.

4. The "basis of settlement prescribed by the Wheeling ordinance," whether taken alone or in connection with any legislation or constitutional provision, was never binding "on both States" or on either State.

It was not referred to in the case of *Virginia* v. *West Virginia*, 11 Wall. 39, and, as shown by Mr. Faulkner, the counsel for West Virginia in that case, had no relevancy or connection with the line of argument taken by either the counsel or the court in that case.

The bondholding creditors, whose interests this court has allowed to be represented here, are creditors of Virginia and of West Virginia alike. They are not formal parties to this cause, but their interests are fully recognized and secured by the several acts of the General Assembly of Virginia, which form part of this record, and under which Virginia has received and holds the bonds deposited by them, as a trustee, as to the unfunded one-third of the amounts of such bonds.

On the part of the bondholding creditors, it is insisted that the only just and reasonable plan for ascertaining the proportion of the debt proper to be borne by West Virginia, is that stated and approved by the writers on international or public law, and which was adopted by this court, in its opinion, delivered by Mr. Justice Field, in *Hartman* v. *Greenhow*, 102 U. S. 672.

Both on the ground of international law, and on the express provision of the constitution of the State, under which Congress admitted it into the Union, the liability of West Virginia, for an equitable proportion of the public debt of Virginia, appears to be inevitable.

The bonds evidencing the public debt of Virginia, prior to the first day of January, 1861, and deposited by the holders thereof, with the Commonwealth of Virginia, under the provisions of the several funding acts, were not cancelled or extinguished as to the one-third of the amount thereof, estimated to be the equitable proportion of such debt to be borne by the State of West Virginia.

The Commonwealth of Virginia has never been discharged from liability on the bonds issued by her prior to January 1, 1861, except as to the extent of the two-thirds of the amount thereof for which amount the holders surrendered them, as to such two-thirds, and received in lieu thereof the new bonds of the Commonwealth.

The Wheeling ordinance, as shown by its title, was "to provide for the formation of a new State, out of a portion of the territory of this State." All of its sections, except the ninth, were directed to that end. The State was formed when its constitution was framed and adopted by its people. The ordinance then became *functus officio*, and ceased to have any operation. The ninth section, as contended by counsel for West Virginia, was a proposition made by Virginia and tendered to West Virginia.

West Virginia's time for accepting it, was when she was assembled in convention in November, 1861; then, and

only then, while she was framing her constitution could she have signified her acceptance of the proposition, by embodying it in her constitution. She did not embody it. She embodied something altogether different, and made no reference to the ninth section of the Wheeling ordinance.

A "plan by which the new State should ascertain her just proportion of the public debt of Virginia" was not a matter as to which the parent State, Virginia, could prescribe or dictate terms to the new State. In none of the compacts made by States does it appear that the parent State has ever sought or been allowed to impose on the new State any such burdens, limitations or conditions, as were not immediately connected with the territory ceded to the new State. The extent of such territory, its boundaries, and the rights and assessments incident thereto, and these only, can be the subject-matters of such compacts. All other matters fall within the domestic power and control of the new State.

At no time and in no manner did West Virginia ever accept the proposition contained in the ninth section of the Wheeling ordinance. The provision made by West Virginia in her constitution was not an acceptance of the ninth section of the Wheeling ordinance. It differed in its most material features from that section. Acceptance of a proposition must be absolute and unconditional without the omission or addition of a single term.

The method of ascertainment proposed by the ninth section of the ordinance cannot be accepted as a proper plan for ascertaining West Virginia's just proportion of the public debt of Virginia, because—as the master has found in his report—"The Wheeling ordinance is not predicated upon the *amount* of the public debt," and counsel for West Virginia have repeatedly stated that "the ninth section of the ordinance has no relation to the amount of the public debt of Virginia," etc. "The amount of the

Virginia debt is not a factor to be taken into consideration in ascertaining West Virginia's just proportion."

The "just proportion" of an amount cannot be ascertained without knowing the *amount* itself.

The convention that framed the constitution for the proposed new State did not regard itself as bound by any suggestions offered by the Wheeling ordinance. It either ignored or repudiated the suggestion made as to the name of the new State, and also as to the plan for ascertaining the proper proportion of the public debt of Virginia to be borne by West Virginia.

The act of Congress of December 31, 1862, admitting the State of West Virginia into the Union, did not refer to the Wheeling ordinance, but did refer only to the act of the Virginia legislature and to the constitution adopted by West Virginia.

The act of the legislature of Virginia giving consent to the erection of the new State within its territory did not refer to the Wheeling ordinance, and her consent was not given on any condition, either express or implied, that the ordinance or any of its provisions should form a compact between the two States, but such consent was given to the formation of the new State according to the boundaries and under the provisions set forth in the constitution for the said State of West Virginia, proposed by the convention which assembled in Wheeling on November 26, 1861.

The Wheeling ordinance was adopted by a convention which sat in August, 1861, and the purpose of the Virginia legislature appears to have been to exclude the inference that it referred in any way to the acts of that convention.

*Mr. Charles E. Hogg, Mr. George W. McClintic* and *Mr. John C. Spooner,* with whom *Mr. William G. Conley,* Attorney General of the State of West Virginia, *Mr.*

*Wm. Mollohan, Mr. Wm. M. O. Dawson* and *Mr. W. G. Matthews* were on the brief, for West Virginia:

When the great transactions occurred which are under review, the Confederate States of America had been formed. Ordinances of secession had been passed by South Carolina, Georgia, Florida, Alabama, Mississippi and Louisiana. Virginia had passed an ordinance of secession, had borrowed $1,000,000, had called for 10,000 men to serve for twelve months and has arranged with the Confederate government for admission to the Confederacy, and in the meantime that her troops should, under the Confederate government, be employed against the United States.

Her troops had seized the Norfolk and Gossport Navy Yards, the arsenal at Harper's Ferry, the Customs Houses, and other property of the United States within her borders; had hauled down the flag of the United States and hoisted in its place another. President Buchanan in a message to Congress had taken the position that there was no power in the Federal Government under the Constitution to coerce a State. Fort Sumter had been surrendered.

President Lincoln had called for 75,000 troops to serve three months. The battle of Bull Run had been fought in which the Federal troops were disastrously defeated. The "New York Tribune," edited by Mr. Greeley, exercising a most potent influence upon public opinion, advocated a peaceful separation of the States determined to withdraw, and many eminent men of undoubted love for the Union in both parties seemed to be of the same opinion. There was grave doubt throughout the country as to the ultimate result. The people of West Virginia could not be blind to the fact that if the Confederacy should be established, that territory would, unless action were taken, be irrevocably a part of that Confederacy.

Isolated from eastern Virginia, and differing in senti-

ment from her people in respect to the right of secession and the institution of slavery, her people are not to be justly chided here or elsewhere for embracing that opportunity to become a State in the Union. In this situation, is to be found the genesis of West Virginia; and in the light of this situation, her people are to be judged and her compacts and "constating" instruments are to be construed.

This court has never decided that when a State is divided the debts of the original State should be ratably apportioned between it and the new State. That question was not involved in or decided by either *Hartman* v. *Greenhow*, 102 U. S. 672, or *Antoni* v. *Greenhow*, 107 U. S. 769.

The true rule of public law in case of the division of a State is that general debts are apportioned on the basis of taxable value. Local debts are assumed by the State for the exclusive benefit of whose territory they were incurred. See Hall's International Law, 78, 80. No rule of international law concerning this point can be said to exist, although many treaties have stipulated a devolution of a part of the debt of the predecessor upon its successor. See also Treaty of Berlin of 1878, and Huber, Nos. 125–135 and 205; Oppenheim's Int. Law, § 84; and Glenn's Int. Law, 36. As to effect of change of sovereignty upon the public rights and obligations, see Hannis Taylor, Int. Law, §§ 166, 168. Pradier Fodéré, in "Traité de Droit International Public," Vol. 1, § 156, states that the state to which cession is made is bound by local debts of ceded territory.

Bluntschli says, § 59, that the debts of the state ought not to be divided proportionally to the population, but that the taxes furnish a juster basis. Bonfils, 3d ed., §§ 223–226, limits the liability exclusively to the debts contracted for the exclusive benefit of its territory, and makes taxation the basis. Franz v. Liszt, University of

Berlin, 2d ed., Berlin, 1902, § 23, p. 175, takes the same view; see also Piédelièvre, Paris, 1894, §§ 154, 155. The proportion of the debt to be borne should be determined in accordance with the relative wealth of the detached portion and of the remainder of the dismembered state, and this wealth is disclosed by the taxes. Alphonse Rivier, Paris, 1896, Vol. 1, p. 213 (Art. 40, V).

Pasquale Fiore, Int. Law, § 132, of his codified Int. Law, § 360 of Nouveau Droit International, says that Bluntschli is correct, that the apportionment should not be made proportionally to population, but apportioned proportionally to the taxes. Pradier Fodéré, §§ 156, 157, states that the state to which cession is made is bound by local debts of ceded territory, citing as instances the acquisition of Lombardy and Venice by Italy, and the Alsace-Lorraine cession of 1871, as the general rule, to which the treaty of Berlin of 1878, imposing part of the public Turkish debt upon Bulgaria, Montenegro, Servia, was an exception.

Max Huber, on Staatensuccession (1898), says, pp. 90–92, § 34, that the division *pro rata regionis* has no reasonable basis, and on p. 96 limits the assumption to special debts; see also § 272, as to debts incurred in the interest of the particular domain. See also Henri Appleton on Annexation and Debts, Paris, 1895, Ch. IV, § II, 65–67.

Even if the court should be of opinion that the rule of international law does not govern the present case, yet if the court, apart from the method prescribed by the ordinance and notwithstanding the provision in the constitution of West Virginia referring the matter for ascertainment to the legislature of that State, should undertake to determine the equitable proportion of the old Virginia debt which West Virginia should assume, it cannot fail to give great weight to the authorities on international law which we have cited. The rules of international law are

based entirely upon considerations of equity and fairness. They have no force nor sanction except from the consent of nations by reason of their evident justice. This court, therefore, in determining what would be an equitable apportionment of the Virginia debt, would undoubtedly desire to take into most careful consideration the unanimous opinion of the modern international law authorities that, in apportioning the debt of a state after its division, equity requires a distinction to be made between the portion of the debt which is local or special in its character and that which is general, so that the parent state and the new state are bound respectively to assume the whole of the local debts relating to their respective territories, leaving only the general debt to be apportioned on the basis of taxable value.

The distinction between general and local debts was recognized in the division of territory of Dakota. Act of Congress of Feby. 22, 1889, § 6, 25 U. S. Stat. 682.

The distinction between general and special debt was discussed in negotiation of treaty between United States and Spain. The American commissioners recognized the distinction, but refused to accede to the demand of Spain, upon the ground that Cuba had had no debt, but, on the contrary, had been a self-supporting colony, and the commissioners considered that the indebtedness was incurred, and its proceeds used, to wage war upon Cuba and to resist by arms the aspirations and struggles of her people to be freed from long-continued despotism and misrule and that the debt was, therefore, a part of Spain's national or general debt.

If we had taken over Cuba in the absence of strife between Cuba and Spain and the United States and Spain, and there had been found an indebtedness incurred by Spain, the proceeds of which had been expended in public improvements in Cuba and for the benefit and betterment of the island and its inhabitants, the question would have

been a different one, and from the standpoint of international law and justice, our attitude must have been different.

The distinction between general debt and local debt is substantial and just and rests upon a sound principle.

The public debt of Virginia prior to January 1, 1861, was a local or special and not a general debt.

In respect of all of the debt, the proceeds of which were expended in West Virginia, the schedule shows that the loans which she effected were numbered as required by law, the certificate of debt or certificates of debt, referring to the act which authorized the particular expenditure, so that it is not only true that the debt represents expenditures for internal improvements, but it is true, so far as the expenditures in West Virginia were concerned, that the moneys which were expended, the proceeds of loans, are traceable to the particular improvements and the stocks and dividends thereon were pledged for the repayment of the loan.

The rule of public law does not govern this case because the Wheeling ordinance and the constitution of West Virginia constitute a special agreement as to the proportion of the old Virginia debt to be assumed by West Virginia.

Virginia is not in a position to insist upon the elimination of the ordinance from the case. Virginia does not contend that the ordinance has ceased to be binding. There is no conflict between the ordinance and the constitution; the latter was adopted within ninety days of the former. The constitutional provision was silent as to method. There was no occasion for repeating in it the language of the ordinance so recently adopted as to the ordinance being a compact. See *Virginia* v. *West Virginia*, 11 Wall. 39; and as to whether Congress consented to it, see *Virginia* v. *Tennessee*, 148 U. S. 503; *Wedding* v.

*Meyler,* 192 U. S. 582.   It certainly was a compact, and wherever it was not carried into the constitution, it remains binding as such.

When the Congress admitted West Virginia into the Union, there were two States, and the ordinance so far as it· was not merged into the constitution, was a compact binding from the beginning.

The vice in the argument for Virginia is in the assumption that the ordinance is to be read as if it consisted only of these words: The new State shall take upon itself a just proportion of the public debt of Virginia prior to the first of January, 1861.   The ordinance was not confined to the debt.

"Just" and "equitable" are synonymous.   See Webster; "1. Justice, right."

If the ordinance is in conflict with the constitution the ordinance must be wholly eliminated; and with the ordinance eliminated the ascertainment of West Virginia's proportion of the debt must be left to the legislature of West Virginia.   What proportion of the debt of a county or a city or a town which is divided by legislative authority, shall be borne by the portion set off to make a new town, or included within the boundaries of another county, city or town, is a legislative question and not a judicial one.   *Laramie Co.* v. *Albany Co.,* 92 U. S. 307; *Mount Pleasant* v. *Beckwith,* 100 U. S. 514.   If the legislature of West Virginia has failed, with or without justification, to discharge the duty imposed upon it by the constitution, the matter was left by the legislature of Virginia and by the Congress to the honor of the legislature of West Virginia.   There is no recourse to courts. With the ordinance eliminated the matter is not justiciable.   *Tulare County* v. *Kings County,* 117 California, 195; *Los Angeles County* v. *Orange County,* 97 California, 329; *Taylor* v. *Brewer,* 1 Maule & Selwin, 290; and *Cummer* v. *Butts,* 40 Michigan, 322.

This court, however, has declared that the ordinance and the constitution do not conflict and are to be read in *pari materia.* See former opinion in this case, 206 U. S. 290, 319.

The master was right in holding that bonds held by the Sinking Fund and by the Literary Fund were not a part of the public debt of Virginia. *Board of Public Works* v. *Gannt,* 76 Virginia, 465; *Louisiana* v. *Jumel* and *Elliott* v. *Wiltz,* 107 U. S. 711.

The master was right in excluding under paragraph III of the decree expenditures by corporations in which Virginia was a stockholder.

Virginia legislature and courts recognize the distinction between private corporations with stock and public corporations without stock. *Sayre* v. *The Northwestern Turnpike Road,* 10 Leigh, 454.

The master was wrong in finding that interest on the public debt of Virginia was part of the ordinary expenses of the state government.

Interest on a state debt is not an ordinary expense of government because it is payable only during a limited period.

Interest on the old Virginia debt was not an ordinary expense of government because the debt was incurred for extraordinary purposes.

West Virginia is not bound to pay interest from January 1, 1861, on the proportion of the old Virginia debt assumed by her.

There is no basis for Virginia's claim for interest. *Commonwealth* v. *Marston's Administrator,* 9 Leigh, 36.

Neither by the ordinance nor by her constitution did West Virginia *in præsenti* assume any portion of the public debt of Virginia.

The Virginia rule as to private contracts that interest follows the principal does not and cannot apply to contracts between sovereign States. *Higginbotham's Execu-*

*trix* v. *Commonwealth,* 25 Grattan, 627, does not apply in this case.

*United States* v. *North Carolina,* 136 U. S. 211, holds that interest is not to be awarded against a sovereign government, unless its consent to pay interest has been clearly manifested by an act of its legislature, or by a lawful contract of its executive officers. Citing *United States* v. *Sherman,* 98 U. S. 565; *Angarica* v. *Bayard,* 127 U. S. 251, 260.

West Virginia did not agree to assume a just proportion of all the outstanding obligations of Virginia, but only of her debt.

There is no evidence that the improvements constructed by Virginia within her present limits were for the benefit of the region now West Virginia.

Under the ordinance and her constitution West Virginia cannot be charged with interest until after the ascertainment, in the manner prescribed, of her equitable proportion of the old Virginia debt.

If there had been any intent to assume, or pay, the accrued interest on the bonds of Virginia, outstanding, the constitution would have so expressed it.

Following the principle announced in *United States* v. *North Carolina,* 136 U. S. 211, many of the state courts have laid down in distinct terms the same proposition. *Sawyer* v. *Colgan,* 102 Florida, 293; *Hawkins* v. *Mitchell,* 34 Florida, 421; *Molineaux* v. *State,* 109 Florida, 380; *Flint &c. R. R. Co.* v. *State Auditors,* 102 Michigan, 502; *Carr* v. *State,* 127 Indiana, 204; *S. C.,* 22 Am. St. Rep. 624, note, p. 448.

Virginia alone is responsible for the delay in apportioning the debt and West Virginia cannot be charged with that delay.

MR. JUSTICE HOLMES delivered the opinion of the court.

This is a bill brought by the Commonwealth of Vir-

ginia to have the State of West Virginia's proportion of the public debt of Virginia as it stood before 1861 ascertained and satisfied. The bill was set forth when the case was before this court on demurrer. 206 U. S. 290. Nothing turns on the form or contents of it. The object has been stated. The bill alleges the existence of a debt contracted between 1820 and 1861 in connection with internal improvements intended to develop the whole State, but with especial view to West Virginia, and carried through by the votes of the representatives of the West Virginia counties. It then sets forth the proceedings for the formation of a separate State and the material provisions of the ordinance adopted for that purpose at Wheeling on August 20, 1861, the passage of an act of Congress for the admission of the new State under a constitution that had been adopted, and the admission of West Virginia into the Union, all of which we shall show more fully a little further on. Then follows an averment of the transfer in 1863 to West Virginia of the property within her boundaries belonging to West Virginia, to be accounted for in the settlement thereafter to be made with the last-named State. As West Virginia gets the benefit of this property without an accounting, on the principles of this decision, it needs not to be mentioned in more detail. A further appropriation to West Virginia is alleged of $150,000, together with unappropriated balances, subject to accounting for the surplus on hand received from counties outside of the new State. Then follows an argumentative averment of a contract in the constitution of West Virginia to assume an equitable proportion of the above-mentioned public debt, as hereafter will be explained. Attempts between 1865 and 1872 to ascertain the two States' proportion of the debt and their failure are averred, and the subsequent legislation and action of Virginia in arranging with the bondholders, that will be explained hereafter so far as needs. Substantially all the bonds outstanding in 1861

have been taken up. It is stated that both in area of territory and in population West Virginia was equal to about one-third of Virginia, that being the proportion that Virginia asserts to be the proper one for the division of the debt, and this claim is based upon the division of the State, upon the above-mentioned Wheeling ordinance and the constitution of the new State, upon the recognition of the liability by statute and resolution, and upon the receipt of property as has been stated above. After stating further efforts to bring about an adjustment and their failure, the bill prays for an accounting to ascertain the balance due to Virginia in her own right and as trustee for bondholders and an adjudication in accord with this result.

The answer admits a debt of about $33,000,000, but avers that the main object of the internal improvements in connection with which it was contracted was to afford outlets to the Ohio River on the west and to the seaboard on the east for the products of the eastern part of the State, and to develop the resources of that part, not those of what is now West Virginia. In aid of this conclusion it goes into some elaboration of details. It admits the proceedings for the separation of the State and refers to an act of May, 1862, consenting to the same, to which we also shall refer. It denies that it received property of more than a little value from Virginia or that West Virginia received more than belonged to her in the way of surplus revenue on hand when she was admitted to the Union, and denies that any liability for these items was assumed by her constitution. It sets forth in detail the proceedings looking to a settlement, but as they have no bearing upon our decision we do not dwell upon them. It admits the transactions of Virginia with the bondholders and sets up that they discharged the Commonwealth from one-third of its debt and that what may have been done as to two-thirds does not concern the defend-

ant, since Virginia admits that her share was not less than
that.  If the bonds outstanding in 1861 have been taken
up it is only by the issue of new bonds for two-thirds and
certificates to be paid by West Virginia alone for the other
third.  Liability for any payments by Virginia is denied
and accountability, if any, is averred to be only on the
principle of § 9 of the Wheeling ordinance, to be stated.
It is set up further that under the constitution of West
Virginia her equitable proportion can be established by
her legislature alone, that the liquidation can be only in
the way provided by that instrument, and hence that this
suit cannot be maintained.  The settlement by Virginia
with her creditors also is pleaded as a bar, and that she
brings this suit solely as trustee for them.

The grounds of the claim are matters of public history.
After the Virginia ordinance of secession, citizens of the
State who dissented from that ordinance organized a gov-
ernment that was recognized as the State of Virginia by
the Government of the United States.  Forthwith a con-
vention of the restored State, as it was called, held at
Wheeling, proceeded to carry out a long entertained wish
of many West Virginians by adopting an ordinance for the
formation of a new State out of the western portion of the
old Commonwealth.  A part of § 9 of the ordinance was as
follows: "The new state shall take upon itself a just pro-
portion of the public debt of the Commonwealth of Vir-
ginia prior to the first day of January, 1861, to be ascer-
tained by charging to it all state expenditures within the
limits thereof, and a just proportion of the ordinary ex-
penses of the state government, since any part of said
debt was contracted; and deducting therefrom the monies
paid into the treasury of the Commonwealth from the
counties included within the said new state during the
said period.".  Having previously provided for a popular
vote, a constitutional convention, etc., the ordinance in
§ 10 ordained that when the General Assembly should give

its consent to the formation of such new State, it should forward to the Congress of the United States such consent, together with an official copy of such constitution, with the request that the new State might be admitted into the union of States.

A constitution was framed for the new State by a constitutional convention, as provided in the ordinance, on November 26, 1861, and was adopted. By Article 8, § 8, "An equitable proportion of the public debt of the Commonwealth of Virginia, prior to the first day of January in the year one thousand eight hundred and sixty-one, shall be assumed by this State; and the Legislature shall ascertain the same as soon as may be practicable, and provide for the liquidation thereof, by a sinking fund sufficient to pay the accruing interest, and redeem the principal within thirty-four years." An act of the legislature of the restored State of Virginia, passed May 13, 1862, gave the consent of that legislature to the erection of the new State "under the provisions set forth in the constitution for the said State of West Virginia." Finally Congress gave its sanction by an act of December 31, 1862, c. 6; 12 Stat. 633, which recited the framing and adoption of the West Virginia constitution and the consent given by the legislature of Virginia through the last mentioned act, as well as the request of the West Virginia convention and of the Virginia legislature, as the grounds for its consent. There was a provision for the adoption of an emancipation clause before the act of Congress should take effect, and for a proclamation by the President, stating the fact, when the desired amendment was made. Accordingly, after the amendment and a proclamation by President Lincoln, West Virginia became a State on June 20, 1863.

It was held in 1870 that the foregoing constituted an agreement between the old State and the new, *Virginia v. West Virginia*, 11 Wall. 39, and so much may be taken

practically to have been decided again upon the demurrer in this case, although the demurrer was overruled without prejudice to any question. Indeed, so much is almost if not quite admitted in the answer. After the answer had been filed the cause was referred to a master by a decree made on May 4, 1908, 209 U. S. 514, 534, which provided for the ascertainment of the facts made the basis of apportionment by the original Wheeling ordinance, and also of other facts that would furnish an alternative method if that prescribed in the Wheeling ordinance should not be followed; this again without prejudice to any question in the cause. The master has reported, the case has been heard upon the merits, and now is submitted to the decision of the court.

The case is to be considered in the untechnical spirit proper for dealing with a quasi-international controversy, remembering that there is no municipal code governing the matter, and that this court may be called on to adjust differences that cannot be dealt with by Congress or disposed of by the legislature of either State alone. *Missouri* v. *Illinois*, 200 U. S. 496, 519, 520. *Kansas* v. *Colorado*, 206 U. S. 46, 82–84. Therefore we shall spend no time on objections as to multifariousness, laches and the like, except so far as they affect the merits, with which we proceed to deal. See *Rhode Island* v. *Massachusetts*, 14 Peters, 210, 257. *United States* v. *Beebe*, 127 U. S. 338.

The amount of the debt January 1, 1861, that we have to apportion no longer is in dispute. The master's finding was accepted by West Virginia and at the argument we understood Virginia not to press her exception that it should be enlarged by a disputed item. It was $33,897,073.82, the sum being represented mainly by interest-bearing bonds. The first thing to be decided is what the final agreement was that was made between the two States. Here again we are not to be bound by techni-

cal form. A State is superior to the forms that it may require of its citizens. But there would be no technical difficulty in making a contract by a constitutive ordinance if followed by the creation of the contemplated State. *Wedding* v. *Meyler*, 192 U. S. 573, 583. And, on the other hand, there is equally little difficulty in making a contract by the constitution of the new State, if it be apparent that the instrument is not addressed solely to those who are to be subject to its provisions, but is intended to be understood by the parent State and by Congress as embodying a just term which conditions the parent's consent. There can be no question that such was the case with West Virginia. As has been shown, the consent of the legislature of the restored State was a consent to the admission of West Virginia under the provisions set forth in the constitution for the would-be State, and Congress gave its sanction only on the footing of the same constitution and the consent of Virginia in the last-mentioned act. These three documents would establish a contract without more. We may add, with reference to an argument to which we attach little weight, that they establish a contract of West Virginia with Virginia. There is no reference to the form of the debt or to its holders, and it is obvious that Virginia had an interest that it was most important that she should be able to protect. Therefore West Virginia must be taken to have promised to Virginia to pay her share, whoever might be the persons to whom ultimately the payment was to be made.

We are of opinion that the contract established as we have said is not modified or affected in any practical way by the preliminary suggestions of the Wheeling ordinance. Neither the ordinance nor the special mode of ascertaining a just proportion of the debt that it puts forward is mentioned in the constitution of West Virginia, or in the act of Virginia giving her consent, or in the act of Congress by which West Virginia became a State. The ordi-

nance required that a copy of the new constitution should be laid before Congress, but said nothing about the ordinance itself. It is enough to refer to the circumstances in which the separation took place to show that Virginia is entitled to the benefit of any doubt so far as the construction of the contract is concerned. See opinion of Attorney-General Bates to President Lincoln, 10 Op. Atty. Gen. 426. The mode of the Wheeling ordinance would not throw on West Virginia a proportion of the debt that would be just, as the ordinance requires, or equitable, according to the promise of the constitution, unless upon the assumption that interest on the public debt should be considered as part of the ordinary expenses referred to in its terms. That we believe would put upon West Virginia a larger obligation than the mode that we adopt, but we are of opinion that her share should be ascertained in a different way. All the modes, however, consistent with the plain contract of West Virginia, whether under the Wheeling ordinance or the constitution of that State, come out with surprisingly similar results.

It was argued, to be sure, that the debt of Virginia was incurred for local improvements and that in such a case, even apart from the ordinance, it should be divided according to the territory in which the money was expended. We see no sufficient reason for the application of such a principle to this case. In form the aid was an investment. It generally took the shape of a subscription for stock in a corporation. To make the investment a safe one the precaution was taken to require as a condition precedent that two or three-fifths of the stock should have been subscribed for by solvent persons fully able to pay, and that one-fourth of the subscriptions should have been paid up into the hands of the treasurer. From this point of view the venture was on behalf of the whole State. The parties interested in the investment were the same, wherever the sphere of corporate action might be. The whole State

would have got the gain and the whole State must bear the loss, as it does not appear that there are any stocks of value on hand. If we should attempt to look farther, many of the corporations concerned were engaged in improvements that had West Virginia for their objective point, and we should be lost in futile detail if we should try to unravel in each instance the ultimate scope of the scheme. It would be unjust, however, to stop with the place where the first steps were taken and not to consider the purpose with which the enterprise was begun. All the expenditures had the ultimate good of the whole State in view. Therefore we adhere to our conclusion that West Virginia's share of the debt must be ascertained in a different way. In coming to it we do but apply against West Virginia the argument pressed on her behalf to exclude her liability under the Wheeling ordinance in like cases. By the ordinance West Virginia was to be charged with all state expenditures within the limits thereof. But she vigorously protested against being charged with any sum expended in the form of a purchase of stocks.

But again, it was argued that if this contract should be found to be what we have said, then the determination of a just proportion was left by the constitution to the legislature of West Virginia, and that irrespectively of the words of the instrument it was only by legislation that a just proportion could be fixed. These arguments do not impress us. The provision in the constitution of the State of West Virginia that the legislature shall ascertain the proportion as soon as may be practicable was not intended to undo the contract in the preceding words by making the representative and mouthpiece of one of the parties the sole tribunal for its enforcement. It was simply an exhortation and command from supreme to subordinate authority to perform the promise as soon as might be and an indication of the way. Apart from the

language used, what is just and equitable is a judicial question similar to many that arise in private litigation, and in nowise beyond the competence of a tribunal to decide.

The ground now is clear, so far as the original contract between the two States is concerned. The effect of that is that West Virginia must bear her just and equitable proportion of the public debt as it was intimated in *Hartman* v. *Greenhow*, 102 U. S. 672, so long ago as 1880, that she should. It remains for us to consider such subsequent acts as may have affected the original liability or as may bear on the determination of the amount to be paid. On March 30, 1871, Virginia, assuming that the equitable share of West Virginia was about one-third, passed an act authorizing an exchange of the outstanding bonds, etc., and providing for the funding of two-thirds of the debt with interest accrued to July 1, 1871, by the issue of new bonds bearing the same rate of interest as the old, six per cent. There were to be issued at the same time, for the other one-third, certificates of same date, setting forth the amount of the old bond that was not funded, that payment thereof with interest at the rate prescribed in the old bond would be provided for in accordance with such settlement as should be had between Virginia and West Virginia in regard to the public debt, and that Virginia held the old bonds in trust for the holder or his assignees. There were further details that need not be mentioned. The coupons of the new bonds were receivable for all taxes and demands due to the State. *Hartman* v. *Greenhow*, 102 U. S. 672. *McGahey* v. *Virginia*, 135 U. S. 662. The certificates issued to the public under this statute and outstanding amount to $12,703,451.79.

The burden under the statute of 1871 still being greater than Virginia felt able to bear, a new refunding act was passed on March 28, 1879, reducing the interest and providing that Virginia would negotiate or aid in negotiating

with West Virginia for the settlement of the claims of certificate holders and that the acceptance of certificates 'for West Virginia's one-third' under this act should be an absolute release of Virginia from all liability on account of the same. Few of these certificates were accepted. On February 14, 1882, another attempt was made, but without sufficient success to make it necessary to set forth the contents of the statute. The certificates for balances not represented by bonds, "constituting West Virginia's share of the old debt," stated that the balance was "to be accounted for by the state of West Virginia without recourse upon this commonwealth."

On February 20, 1892, a statute was passed which led to a settlement, described in the bill as final and satisfactory. This provided for the issue of bonds for nineteen million dollars in exchange for twenty-eight millions outstanding, not funded, the new bonds bearing interest at two per cent for the first ten years and three per cent for ninety years; and certificates in form similar to that just stated, in the act of 1882. On March 6, 1894, a joint resolution of the Senate and House of Delegates was passed, reciting the passage of the four above mentioned statutes, the provisions for certificates, and the satisfactory adjustment of the liabilities assumed by Virginia on account of two-thirds of the debt, and appointing a committee to negotiate with West Virginia, when satisfied that a majority of the certificate holders desired it and would accept the amount to be paid by West Virginia in full settlement of the one-third that Virginia had not assumed. The State was to be subjected to no expense. Finally an act of March 6, 1900, authorized the commission to receive and take on deposit the certificates, upon a contract that the certificate holders would accept the amount realized from West Virginia in full settlement of all their claims under the same. It also authorized a suit if certain proportions of the certificates should be so de-

posited, as since then they have been—the State, as before, to be subjected to no expense.

On January 9, 1906, the commission reported that apart from certificates held by the State and not entering into this account, there were outstanding of the certificates of 1871 in the hands of the public $12,703,451.79, as we have said, of which the commission held $10,851,294.09, and of other certificates there were in the hands of the public $2,778,239.80, of which the commission held $2,322,141.32.

On the foregoing facts a technical argument is pressed that Virginia has discharged herself of all liability as to one-third of the debt; that, therefore, she is without interest in this suit, and cannot maintain it on her own behalf; that she cannot maintain it as trustee for the certificate holders, *New Hampshire* v. *Louisiana*, 108 U. S. 76; and that the bill is multifarious in attempting to unite claims made by the plaintiff as such trustee with some others set up under the Wheeling ordinance, etc., which, in the view we take, it has not been necessary to mention or discuss. We shall assume it to be true for the purposes of our decision, although it may be open to debate, *Greenhow* v. *Vashon*, 81 Virginia, 336, 342, 343, that the certificate holders who have turned in their certificates, being much the greater number, as has been seen, by doing so, if not before, surrendered all claims under the original bonds or otherwise against Virginia to the extent of one-third of the debt. But even on that concession the argument seems to us unsound.

The liability of West Virginia is a deep-seated equity, not discharged by changes in the form of the debt, nor split up by the unilateral attempt of Virginia to apportion specific parts to the two States. If one-third of the debt were discharged in fact, to all intents, we perceive no reason, in what has happened, why West Virginia should not contribute her proportion of the remaining

two-thirds. But we are of opinion that no part of the debt is extinguished, and further, that nothing has happened to bring the rule of *New Hampshire* v. *Louisiana* into play. For even if Virginia is not liable she has the contract of West Virginia to bear an equitable share of the whole debt, a contract in the performance of which the honor and credit of Virginia is concerned, and which she does not lose her right to insist upon by her creditors accepting from necessity the performance of her estimated duty as confining their claims for the residue to the party equitably bound. Her creditors never could have sued her if the supposed discharge had not been granted, and the discharge does not diminish her interest and right to have the whole debt paid by the help of the defendant. The suit is in Virginia's own interest, none the less that she is to turn over the proceeds. See *United States* v. *Beebe,* 127 U. S. 338, 342. *United States* v. *Nashville, Chattanooga & St. Louis Ry. Co.,* 118 U. S. 120, 125, 126. Moreover, even in private litigation it has been held that a trustee may recover to the extent of the interest of his *cestui que trust. Lloyd's* v. *Harper,* 16 Ch. D. 290, 309, 315. *Lamb* v. *Vice,* 6 M. & W. 467, 472. We may add that in all its aspects it is a suit on the contract, and it is most proper that the whole matter should be disposed of at once.

It remains true then, notwithstanding all the transactions between the old Commonwealth and her bondholders, that West Virginia must bear her equitable proportion of the whole debt. With a qualification which we shall mention in a moment, we are of opinion that the nearest approach to justice that we can make is to adopt a ratio determined by the master's estimated valuation of the real and personal property of the two States on the date of the separation, June 20, 1863. A ratio determined by population or land area would throw a larger share on West Virginia, but the relative resources of the

debtor populations are generally recognized, we think, as affording a proper measure. It seems to us plain that slaves should be excluded from the valuation. The master's figures without them are, for Virginia $300,887,367.74, and for West Virginia $92,416,021.65. These figures are criticised by Virginia, but we see no sufficient reason for going behind them, or ground for thinking that we can get nearer to justice in any other way. It seems to us that Virginia cannot complain of the result. They would give the proportion in which the $33,897,073.82 was to be divided, but for a correction which Virginia has made necessary. Virginia with the consent of her creditors has cut down her liability to not more than two-thirds of the debt, whereas at the ratio shown by the figures her share, subject to mathematical correction, is about .7651. If our figures are correct, the difference between Virginia's share, say $25,931,261.47, and the amount that the creditors were content to accept from her, say $22,598,049.21, is $3,333,212.26; subtracting the last sum from the debt leaves $30,563,861.56 as the sum to be apportioned. Taking .235 as representing the proportion of West Virginia we have $7,182,507.46 as her share of the principal debt.

We have given our decision with respect to the basis of liability and the share of the principal of the debt of Virginia that West Virginia assumed. In any event, before we could put our judgment in the form of a final decree there would be figures to be agreed upon or to be ascertained by reference to a master. Among other things there still remains the question of interest. Whether any interest is due, and if due from what time it should be allowed and at what rate it should be computed, are matters as to which there is a serious controversy in the record, and concerning which there is room for a wide divergence of opinion. There are many elements to be taken into account on the one side and on the other. The circumstances of the asserted default and

the conditions surrounding the failure earlier to procure a determination of the principal sum payable, including the question of laches as to either party, would require to be considered. A long time has elapsed. Wherever the responsibility for the delay might ultimately be placed, or however it might be shared, it would be a severe result to capitalize charges for half a century—such a thing hardly could happen in a private case analogous to this. Statutes of limitation, if nothing else, would be likely to interpose a bar. As this is no ordinary commercial suit, but, as we have said, a quasi-international difference referred to this court in reliance upon the honor and constitutional obligations of the States concerned rather than upon ordinary remedies, we think it best at this stage to go no farther, but to await the effect of a conference between the parties, which, whatever the outcome, must take place. If the cause should be pressed contentiously to the end, it would be referred to a master to go over the figures that we have given provisionally, and to make such calculations as might become necessary. But this case is one that calls for forbearance upon both sides. Great States have a temper superior to that of private litigants, and it is to be hoped that enough has been decided for patriotism, the fraternity of the Union, and mutual consideration to bring it to an end.