## DAVIS v. BOSTON & M. R. CO.
### No. 3213.

Circuit Court of Appeals, First Circuit.
April 14, 1937.

BINGHAM, Circuit Judge, dissenting.

———◆———

See, also, 57 S.Ct. 316, 81 L.Ed. ——.

Edward F. McClennen, of Boston, Mass. (Jacob J. Kaplan, of Boston, Mass., on the brief), for appellant.

Robert H. Jackson, Asst. Atty. Gen., and Charles E. Wyzanski, Jr., Sp. Asst. to the Atty. Gen. (Stanley Reed, Sol. Gen., Sewall Key, J. P. Jackson, Arnold Raum, F. and A. LeSourd, Sp. Assts. to the Atty. Gen., Charles A. Horsky, Atty., and Thomas H. Eliot, Gen. Counsel, Social Security Board, both of Washington, D. C., and Francis J. W. Ford, U. S. Atty., and Arthur L. Murray, Sp. Asst. to the U. S. Atty., both of Boston, Mass., on the brief), for appellees Commissioner of Internal Revenue et al.

Before BINGHAM, WILSON, and MORTON, Circuit Judges.

WILSON, Circuit Judge.

This is an appeal from a decree of the District Court of Massachusetts denying an injunction against the defendants and dismissing the plaintiff's bill.

The original bill attacked the constitutionality of both chapter 531, 49 Stat 620, known as the Social Security Act (42 U.S.C.A. § 301 et seq.), and chapter 151A of the Massachusetts General Laws (see chapter 479 of the Acts and Resolves of 1935 [section 5]); but, after intervention by the Commissioner and Collector of Internal Revenue and the filing of answers and a motion to strike by the intervening defendants, it was stipulated by all the parties that: "the only issue involved in the case, either directly or indirectly, is whether title IX of chapter 531, 49 Stat. 620 [section 901 et seq. (42 U.S.C.A. § 1101 et seq.)], approved Aug. 14, 1935, is an Act of Congress within its powers under the Constitution of the United States, or in violation of the Fifth Amendment thereof; and the only way in which that issue is raised is with respect to the payments under that title IX."

A stockholder in a corporation directly affected may properly invoke the jurisdiction of the federal courts to determine the constitutionality of the act. Carter v. Carter Coal Co., 298 U.S. 238, 56 S.Ct. 855, 80 L.Ed. 160; United States v. Butler, 297 U.S. 1, 56 S.Ct. 312, 80 L.Ed. 477, 102 A.L.R. 914.

The Social Security Act contains eleven titles, each having separate objects in view, viz.: I. Old Age Assistance (section 1 et seq. [42 U.S.C.A. § 301 et seq.]); II. Old Age Benefits (section 201 et seq. [42 U.S.C.A. § 401 et seq.]); III. Unemployment Compensation (section 301 et seq. [42 U.S.C.A. § 501 et seq.]); IV. Aid to Dependent Children (section 401 et seq. [42 U.S.C.A. § 601 et seq.]); V. Maternal and Child Welfare (section 501 et seq. [42 U.S.C.A. § 701 et seq.]); VI. Public Health Work (section 601 et seq. [42 U.S.C.A. § 801 et seq.]); VII. The Creation of a Social Security Board (section 701 et seq. [42 U.S.C.A. § 901 et seq.]); VIII. Taxes with respect to Employment (section 801 et seq. [42 U.S.C.A. § 1001 et seq.]); IX. Taxes for Benefit of Unemployment (section 901 et seq. [42 U.S.C.A. § 1101 et seq.]); X. Grants to State in Aid of the Blind (section 1001 et seq. [42 U.S.C.A. § 1201 et seq.]); XI. General Provisions relating to Definitions, Rules and Separability of the Provisions of the Act (section 1101 et seq. [42 U.S.C.A. § 1301 et seq.]). On its face the entire act was passed to provide financial aid for the unfortunate, the dependent, and those incapacitated by age, or who for any reason are, temporarily, at least, unable to obtain gainful employment.

Title IX imposes a tax on employers of eight or more, except an employer of agricultural labor, domestic servants, or where the service is performed as an officer or member of a vessel on the navigable waters of the United States; or performed by an individual in the employ of son, daughter, or spouse; or by a child under 21 years of age in the employ of his father or mother; or performed in the employ of the United States, or of an instrumentality of the United States; or performed in the employ of a state or a political subdivision thereof, or of one or more states; or services performed in behalf of any charitable organization, or any corporation, no part of the net earnings of which inures to the benefit of any private shareholder or individual.

Apart from these exceptions, the salient features of title IX are contained in the following provisions found in the footnote.[1]

---

[1] Sec. 901. On and after January 1, 1936, every employer (as defined in section 907 [section 1107 of this chapter]) shall pay for each calendar year an excise tax, with respect to having individuals in his employ, equal to the following percentages of the total wages (as defined in section 907 [section 1107 of this chapter]) payable by him (regardless of the time of payment) with respect to employment (as defined in section 907 [section 1107 of this chapter]) during such calendar year;

(1) With respect to employment during the calendar year 1936 the rate shall be 1 per centum;

(2) With respect to employment during the calendar year 1937 the rate shall be 2 per centum;

(3) With respect to employment after December 31, 1937, the rate shall be 3 per centum.

Sec. 902. The taxpayer may credit against the tax imposed by section 901 [section 1101 of this chapter] the amount of contributions, with respect to employ-

The appellant assigned as error that the District Court erred in holding that title IX is a valid act of Congress within its powers under the Constitution of the United States.

Counsel for the appellant contends as grounds for holding that title IX is unauthorized under the powers granted to Congress in the Federal Constitution the following: (1) That it is capricious and arbitrary in its exemptions; (2) that it is not uniform in its application; (3) that the tax imposed on employers is not what it is stated to be in the act, namely, an excise tax, and is not imposed to provide for the general welfare of the United States; (4) that in purpose and effect it is an attempt by Congress to enter into a domain hitherto considered as reserved to the states, and to coerce the states into doing something the federal government has no power to do, viz., to provide compensation for those prevented by any circumstances resulting in unemployment from earning a livelihood; and (5) that it seeks further to regulate indirectly the relations between employee and employer.

We pass over the question of capriciousness and lack of uniformity as not being essential for the determination of the case, although a three-judge court in the middle district of Alabama, in Southern Coal & Coke Co. v. Carmichael, Attorney General (D.C.) 17 F.Supp. 225, has recently held the Alabama statute void on this ground. The important issues, we think, are whether the tax imposed in section 901 of title IX (42 U.S.C.A. § 1101) can be termed an excise tax; and whether the federal government by section 903 of title

ment during the taxable year, paid by him (before the date of filing his return for the taxable year) into an unemployment fund under a State law. The total credit allowed to a taxpayer under this section for all contributions paid into unemployment funds with respect to employment during such taxable year shall not exceed 90 per centum of the tax against which it is credited, and credit shall be allowed only for contributions made under the laws of States certified for the taxable year as provided in section 903 [section 1103 of this chapter].

Sec. 903. (a) The Social Security Board shall approve any State law submitted to it, within thirty days of such submission, which it finds provides that—

(1) All compensation is to be paid through public employment offices in the State or such other agencies as the Board may approve;

(2) No compensation shall be payable with respect to any day of unemployment occurring within two years after the first day of the first period with respect to which contributions are required;

(3) All money received in the unemployment fund shall immediately upon such receipt be paid over to the Secretary of the Treasury to the credit of the Unemployment Trust Fund established by section 904 [section 1104 of this chapter];

(4) All money withdrawn from the Unemployment Trust Fund by the State Agency shall be used solely in the payment of compensation, exclusive of expenses of administration;

(5) Compensation shall not be denied in such State to any otherwise eligible individual for refusing to accept new work under any of the following conditions: (A) If the position offered is vacant due directly to a strike, lockout, or other labor dispute; (B) if the wages, hours, or other conditions of the work offered are substantially less favorable to the individual than those prevailing for similar work in the locality; (C) if as a condition of being employed the individual would be required to join a company union or to resign from or refrain from joining any bona fide labor organization;

(6) All the rights, privileges, or immunities conferred by such law or by acts done pursuant thereto shall exist subject to the power of the legislature to amend or repeal such law at any time. The Board shall, upon approving such law, notify the Governor of the State of its approval.

(b) On December 31, in each taxable year the Board shall certify to the Secretary of the Treasury each State whose law it has previously approved, except that it shall not certify any State which, after reasonable notice and opportunity for hearing to the State agency, the Board finds has changed its law so that it no longer contains the provisions specified in subsection (a) or has with respect to such taxable year failed to comply substantially with any such provision.

(c) If, at any time during the taxable year, the Board has reason to believe that a State whose law it has previously approved, may not be certified under subsection (b), it shall promptly so notify the Governor of such State.

Sec. 904. (a) There is hereby established in the Treasury of the United States a trust fund to be known as the

IX (42 U.S.C.A. § 1103) seeks indirectly to control state action in matters resting solely within the powers reserved to the states under Amendment 10 of the Constitution.

It is not a question of what powers Congress ought to have to meet certain conditions, but what powers are vested in Congress under the Constitution. In determining what they are, we must return to first principles. The care of the unfortunate and the dependent, and the relief of those unable to labor, is a burden imposed on the states and until recently has always been so considered. Congress has no power, either directly or indirectly, to invade this province of the states. Carter v. Carter Coal Co., supra, 298 U.S. 238, at page 295, 56 S.Ct. 855, 80 L.Ed. 1160; Schechter Poultry Corp. v. United States, 295 U.S. 495, 549, 55 S.Ct. 837, 79 L.Ed. 1570, 97 A.L.R. 947.

It is sometimes suggested that, since the states are powerless to solve the problem presented by unemployment in an emergency such as was passed through in the last four years, therefore there must be power in the federal government to meet the situation. A similar suggestion was made in the case of State of Kansas v. Colorado, 206 U.S. 46, at page 89, 27 S.Ct. 655, 664, 51 L.Ed. 956:

"All legislative power must be vested in either the state or the national government; no legislative powers belong to a state government other than those which affect solely the internal affairs of that state; consequently all powers which are national in their scope must be found vested in the Congress of the United States.

"But," the court said, "the proposition that there are legislative powers affecting the nation as a whole which belong to, although not expressed in the grant of powers, is in direct conflict with the doctrine that this is a government of enumerated powers. That this is such a government clearly appears from the Constitution, in-

---

"Unemployment Trust Fund", hereinafter [in this title] called the "Fund". The Secretary of the Treasury is authorized and directed to receive and hold in the Fund all moneys deposited therein by a State agency from a State unemployment fund. Such deposit may be made directly with the Secretary of the Treasury or with any Federal reserve bank or member bank of the Federal Reserve System designated by him for such purpose.

(b) It shall be the duty of the Secretary of the Treasury to invest such portion of the Fund as is not, in his judgment, required to meet current withdrawals. Such investment may be made only in interest bearing obligations of the United States or in obligations guaranteed as to both principal and interest by the United States. For such purpose such obligations may be acquired (1) on original issue at par, or (2) by purchase of outstanding obligations at the market price. The purposes for which obligations of the United States may be issued under the Second Liberty Bond Act, as amended [section 752 of Title 31], are hereby extended to authorize the issuance at par of special obligations exclusively to the Fund. Such special obligations shall bear interest at a rate equal to the average rate of interest, computed as of the end of the calendar month next preceding the date of such issue, borne by all interest-bearing obligations of the United States then forming part of the public debt; except that where such average rate is not a multiple of one-eighth of 1 per centum, the rate of interest of such special obligations shall be the multiple of one-eighth of 1 per centum next lower than such average rate. Obligations other than such special obligations may be acquired for the Fund only on such terms as to provide an investment yield not less than the yield which would be required in the case of special obligations if issued to the Fund upon the date of such acquisition.

(c) Any obligations acquired by the Fund (except special obligations issued exclusively to the Fund) may be sold at the market price, and such special obligations may be redeemed at par plus accrued interest.

(d) The interest on, and the proceeds from the sale or redemption of, any obligations held in the Fund shall be credited to and form a part of the Fund.

(e) The Fund shall be invested as a single fund, but the Secretary of the Treasury shall maintain a separate book account for each State agency and shall credit quarterly on March 31, June 30, September 30, and December 31, of each year, to each account, on the basis of the average daily balance of such account, a proportionate part of the earnings of the Fund for the quarter ending on such date.

(f) The Secretary of the Treasury is authorized and directed to pay out of the Fund to any State agency such amount as it may duly requisition, not exceeding the amount standing to the account of such State agency at the time of such payment. 42 U.S.C.A. §§ 1101–1104.

dependently of the Amendments, for otherwise there would be an instrument granting certain specified things made operative to grant other and distinct things. This natural construction of the original body of the Constitution is made absolutely certain by the 10th Amendment."

Again the Supreme Court very aptly said in Flint v. Stone Tracy Co., 220 U.S. 107, 151, 31 S.Ct. 342, 349, 55 L.Ed. 389, Ann.Cas.1912B, 1312:

"Although there have been from time to time intimations that there might be some tax which was not a direct tax nor included under the words 'duties, imposts, and excises,' such a tax for more than one hundred years of national existence has as yet remained undiscovered, notwithstanding the stress of particular circumstances has invited thorough investigation into sources of revenue." Pollock v. Farmers' Loan & Trust Co., 157 U.S. 429, 557, 15 S.Ct. 673, 39 L.Ed. 759; Thomas v. United States, 192 U.S. 363, 370, 24 S.Ct. 305, 48 L.Ed. 481.

Again in the case of Carter v. Carter Coal Co., supra, 298 U.S. 238, at page 291, 56 S.Ct. 855, 864, 80 L.Ed. 1160, the court said:

"The proposition, often advanced and as often discredited, that the power of the federal government inherently extends to purposes affecting the Nation as a whole with which the states severally cannot deal or cannot adequately deal, and the related notion that Congress, entirely apart from those powers delegated by the Constitution, may enact laws to promote the general welfare, have never been accepted but always definitely rejected by this court."

And again on page 292 of 298 U.S., 56 S.Ct. 855, 864, 80 L.Ed. 1160:

"In the Framers Convention, the proposal to confer a general power akin to that just discussed was included in Mr. Randolph's resolutions, the sixth of which, among other things, declared that the National Legislature ought to enjoy the legislative rights vested in Congress by the Confederation; and 'moreover to legislate in all cases to which the separate States are incompetent, or in which the harmony of the United States may be interrupted by the exercise of individual Legislation.' The convention, however, declined to confer upon Congress power in such general terms; instead of which it carefully limited the powers which it thought wise to intrust to Congress by spec-

ifying them, thereby denying all others not granted expressly or by necessary implication. It made no grant of authority to Congress to legislate substantively for the general welfare, United States v. Butler, supra, 297 U.S. 1, at page 64, 56 S. Ct. 312, 80 L.Ed. 477, 102 A.L.R. 914; and no such authority exists, save as the general welfare may be promoted by the exercise of the powers which are granted."

■ It is well settled that taxation by Congress is limited to those forms of taxes described in section 8 of article 1 of the Constitution, and with respect to these the only limitations are, that a direct tax shall be apportioned between the states and that duties, imposts, and excises shall be uniform and be levied only for the purposes named therein.

■ Is the tax imposed on employers under section 901 of title IX (42 U.S.C.A. § 1101) an excise tax within the meaning of section 8 of article 1 of the Federal Constitution? If it is not, it is not a tax that Congress is authorized to levy. No other provisions of the Constitution than section 8 of article 1 give any powers to Congress to levy taxes and the kind of taxes it might levy are expressly defined therein as direct taxes, duties, imposts, and excise taxes, and these can only be levied to pay the debts and provide for the common defense and general welfare of the United States.

At the time of the adoption of the Constitution the term "excise tax" was used only in connection with a tax on goods, merchandise, and commodities.

Blackstone in his Commentaries, 1 Blackstone, p. 308, in speaking of the different forms of taxation, said:

"Directly opposite in its nature to this (direct tax) is the excise duty; which is an inland imposition, paid sometimes upon the consumption of the commodity, or frequently upon the retail sale, which is the last stage before the consumption."

Adam Smith in 1776 in his "The Wealth of Nations," said:

"The duties of excise are imposed chiefly upon goods of home produce destined for home consumption. They are imposed only upon a few sorts of goods of the more general use. * * * They fall almost altogether upon what I call luxuries."

The tax imposed by the British Act of 1777 and cited by the government in sup-

port of its contention was clearly a luxury tax on male servants. It did not apply to any servant employed for the purpose of husbandry or manufacture, or of any trade or calling by which the employer of such servant earned a profit.

Hamilton in the Federalist, No. 21, speaking of excises, describes them as "Taxes on articles of consumption."

Gallatin speaks of an excise tax as an excise on "consumable commodities."

As defined in Bouvier's Law Dictionary, Rawle's Third Revision, p. 551, commodity is a broader term than merchandise and "may mean almost any description of articles called movable or personal estate. Labor is not a commodity. [Rohlf v. Kasemeier, 140 Iowa, 182, 118 N.W. 276] 23 L. R.A.(N.S.) 1285 [132 Am.St.Rep. 261, 17 Ann.Cas. 750]."

In the discussions in the several state conventions, both as to the adoption of the Federal Constitution and with reference to the adoption of the respective state constitutions, it seems apparent that the understanding of the term "excise tax" was a tax laid upon articles of use or consumption, not according to their value, but an arbitrary amount fixed by the Legislature; and the term "commodity" appears to have been used in its ordinary sense as including goods, wares, merchandise, produce of the land and manufacture.

Massachusetts in framing its Constitution in 1780, in addition to the ordinary direct taxes, authorized the Legislature to impose "reasonable duties and excises upon any produce, goods, wares, merchandise and commodities whatsoever."

Notwithstanding the definition of the word "commodities" found in the dictionaries, the Supreme Court of Massachusetts gave to the word a broader meaning than the lexicographers in the case of Portland Bank v. Apthorp, 12 Mass. 252, 256:

"This last word [commodities] will perhaps embrace every thing, which may be a subject of taxation, and has been applied by our legislature, from the earliest practise under the constitution, to the privilege of using particular branches of business or employment, as the business of an auctioneer, of an attorney, of a tavern keeper, of a retailer of spirituous liquors, etc.

"It must have been under this general term commodity, which signifies convenience, privilege, profit and gains, as well as goods and wares, which are only its vulgar signification, that the legislature assumed the right which has been uniformly and without complaint exercised for thirty years, of exacting a sum of money from attorneys, and barristers at law, vendue masters, tavern keepers and retailers."

The same construction was expressed in O'Keeffe v. Somerville, 190 Mass. 110, 76 N.E. 457, 458, 112 Am.St.Rep. 316, 5 Ann. Cas. 684:

"It is not necessary in the present case to determine the meaning of the word 'commodities,' in reference to every possible application of it, but we are of opinion that it is not broad enough to include every occupation which one may follow, in the exercise of a natural right, without aid from the government, and without affecting the rights or interests of others in such a way as properly to call for governmental regulation. Whatever may be done by the Congress of the United States under its general power to levy excise taxes (see Thomas v. United States, 192 U.S. 363, 24 S.Ct. 305, 48 L.Ed. 481), we are of opinion that, under the limitation to commodities, the general court of Massachuetts cannot levy an excise tax upon the business of a husbandman or an ordinary mechanic. If this is not the necessary effect of the decision in Gleason v. McKay [134 Mass. 419], ubi supra, it certainly is intimated by the language of the court in the opinion."

While the Federal Constitution does not contain the word "commodities" as a basis for levying excise taxes, there appears to be little, if any, difference in the limits imposed upon the interpretation of section 8 of article 1 by the Supreme Court of the United States and the interpretation placed on the constitutional provision of Massachusetts by the Massachusetts Supreme Court.

Mr. Justice Story in his work on the Constitution, §§ 907, 908, says of section 8 of article 1 of the Constitution:

"Before proceeding to consider the nature and extent of the power conferred by this clause, and the reasons on which it is founded, it seems necessary to settle the grammatical construction of the clause, and to ascertain its true reading. Do the words, 'to lay and collect taxes, duties, imposts, and excises', constitute a distinct substantial power; and the words, 'to pay the debts and provide for the common defence and general welfare of the United States,' constitute another distinct and substantial power? Or are the latter words connect-

ed with the former so as to constitute a qualification upon them? This has been a topic of political controversy, and has furnished abundant material for popular declamation and alarm. If the former be the true interpretation, then it is obvious that under color of the generality of the words "and provide for the common defense and general welfare,' the government of the United States is, in reality, a government of general and unlimited powers, notwithstanding the subsequent enumeration of specific powers. If the latter be the true construction, then the power of taxation only is given by the clause, and it is limited to objects of a national character, 'to pay the debts and provide for the common defense and the general welfare.' § 908. The former opinion has been maintained by some minds of great ingenuity and liberality of views. The latter has been the generally received sense of the nation, and seems supported by reasoning at once solid and impregnable. * * * In this sense, Congress has not an unlimited power of taxation; but it is limited to specific objects,—the payment of the public debts, and providing for the common defense and general welfare. A tax, therefore, laid by Congress for neither of these objects, would be unconstitutional, as an excess of its legislative authority."

Excise taxes were defined in Patton v. Brady, 184 U.S. 608, 617, 22 S.Ct. 493, 496, 46 L.Ed. 713, as:

"An inland imposition, paid sometimes upon the consumption of the commodity, or frequently upon the retail sale, which is the last stage before the consumption." And on page 618 of 184 U.S., 22 S.Ct. 493, 497, 46 L.Ed. 713: "To determine, then, what excise means, we have for our guidance, first, an enumeration of the articles that it fell on in Great Britain in 1787. We have, second, the nature of the tax as judicially determined; and we have, third, the definition of it, or the common understanding of men about it, as given by the Encyclopedia Brittanica and the Century Dictionary. Taking these three sources of information and combining them, it would seem that the leading idea of excise is that it is a tax, laid without rule or principle, upon consumable articles, upon the process of their manufacture and upon licenses to sell them."

The court in Flint v. Stone Tracy Co., 220 U.S. 107, 151, 31 S.Ct. 342, 349, 55 L.Ed. 389, Ann.Cas.1912B, 1312, adopted the definition of excise taxes found in Cooley on Constitutional Law (7th Ed.) p. 680:

"Excises are 'taxes laid upon the manufacture, sale, or consumption of commodities within the country, upon licenses to pursue certain occupations, and upon corporate privileges,' " which appears to cover the entire ground.

A somewhat broader definition of excise taxes is found in Thomas v. United States, 192 U.S. 363, 370, 24 S.Ct. 305, 306, 48 L.Ed. 481:

"There is no occasion to attempt to confine the words duties, imposts, and excises to the limits of precise definition. We think that they were used comprehensively to cover customs and excise duties imposed on importation, consumption, manufacture, and sale of certain commodities, privileges, *particular business transactions, vocations, occupations, and the like.*" (Italics supplied.)

Section 901 of title IX (42 U.S.C.A. § 1101) under consideration declares the tax imposed on all employers to be an excise tax, but as the Supreme Court said in Flint v. Stone Tracy Co., supra, 220 U.S. 107, at page 145, 31 S.Ct. 342, 346, 55 L.Ed. 389, Ann.Cas.1912B, 1312:

"While' the mere declaration contained in a statute that it shall be regarded as a tax of a particular character does not make it such if it is apparent that it cannot be so designated consistently with the meaning and effect of the act," although such a declaration may "be entitled to some weight."

It was also held in Flint v. Stone Tracy Co., supra, that the corporation tax imposed under the Tariff Law of 1909 was valid as an excise tax; but in Gleason v. McKay, 134 Mass. 419, 424, where the court was considering a tax laid on firms, copartnerships, and other associations, it was said:

"It will not be seriously contended that the privileges or rights which are taxed by this statute can be properly described as either produce, goods, wares or merchandise. Do they fairly come within the term 'commodities,' in the sense in which it is used in the Constitution? Ever since the adoption of the Constitution, the Legislature in its practice, and this court in its adjudications, have given a very broad and extensive meaning to this term. It has been repeatedly held that corporate franchises enjoyed by grant from the government are commodities, and subject to

an excise. So with corporate franchises granted by a foreign government, which by comity are permitted to be exercised within this Commonwealth. So where the Legislature has thought, upon considerations of public policy, that certain occupations or callings, of a public or quasi public character, should be carried on under governmental regulation, it has been usual to impose a reasonable fee for a license."

The defendant in the above case not being a corporation, but a common-law partnership "it enjoyed no franchise or special privilege conferred upon it by the Legislature, but was exercising a common right." Opinion of Justices, 266 Mass. 590, 592, 593, 165 N.E. 904, 63 A.L.R. 952.

In contrasting these two propositions, the Justices in their opinion in 247 Mass. 589, 593, 143 N.E. 808, 810, said:.

"The right to set up and maintain theatres and other places of public amusement is not natural and inherent. Working by an artisan at his trade, carrying on an ordinary business, or engaging in a common occupation or calling cannot be subjected to a license fee or excise. These plainly are not affected with a public interest"—citing Gleason v. McKay, supra; O'Keeffe v. Somerville, supra.

And on page 597 of 247 Mass., 143 N.E. 808, 811:

"The rights to labor and to do ordinary business are natural, essential and inalienable, partaking of the nature both of personal liberty and of private property."

Cases in which excise taxes have been upheld are: Hylton v. United States, 3 Dallas, 171, 1 L.Ed. 556; License Tax Cases, 5 Wall. 462, 18 L.Ed. 497; Veazie Bank v. Fenno, 8 Wall. 533, 19 L.Ed. 482; Thomas v. United States, 192 U.S. 363, 370, 24 S.Ct. 305, 48 L.Ed. 481; Billings v. United States, 232 U.S. 261, 34 S.Ct. 421, 58 L. Ed. 596; Nicol v. Ames, 173 U.S. 509, 19 S.Ct. 522, 43 L.Ed. 786; Patton v. Brady, 184 U.S. 608, 22 S.Ct. 493, 46 L.Ed. 713; McCray v. United States, 195 U.S. 27, 24 S.Ct. 769, 49 L.Ed. 78, 1 Ann.Cas. 561; Scholey v. Rew, 23 Wall. 331, 23 L.Ed. 99; Knowlton v. Moore, 178 U.S. 41, 20 S.Ct. 747, 44 L.Ed. 969; see, also, Flint v. Stone Tracy Co., 220 U.S. 107, 31 S.Ct. 342, 55 L.Ed. 389, Ann.Cas.1912B, 1312; Spreckels Sugar Refining Co. v. McClain, 192 U.S. 397, 24 S.Ct. 376, 48 L.Ed. 496; Stratton's Independence, Limited, v. Howbert, 231 U.S. 399, 34 S.Ct. 136, 58 L.Ed. 285; Doyle v. Mitchell Brothers Co., 247

U.S. 179, 183, 38 S.Ct. 467, 62 L.Ed. 1054; Stanton v. Baltic Mining Co., 240 U.S. 103, 114, 36 S.Ct. 278, 60 L.Ed. 546. .

The Child Labor Tax Case, 259 U.S. 20, 42 S.Ct. 449, 66 L.Ed. 817, 21 A.L.R. 1432; Carter v. Carter Coal Co., 298 U.S. 238, 56 S.Ct. 855, 80 L.Ed. 1160; United States v. Butler, 297 U.S. 1, 56 S.Ct. 312, 80 L.Ed. 477, 102 A.L.R. 914; Grosjean v. American Press Co., Inc., et al., 297 U.S. 233, 56 S.Ct. 444, 80 L.Ed. 660; and Hill v. Wallace, 259 U.S. 44, 42 S.Ct. 453, 66 L.Ed. 822, are cases where so-called excise taxes have been held not to be within the powers vested in Congress as involving matters reserved to the states. .

But nowhere do we find that an excise tax has ever been imposed in this country on the natural right to employ labor in manufacturing, or in any trade or calling for profit.

It is urged that the tax imposed under section 901 of title IX (42 U.S.C.A. § 1101) is imposed on the privilege of doing business. If Congress had so intended, we think it would have said so. Section 901 does not impose a tax on any business in which any employer may be engaged, nor on the manufacture of any goods, wares, merchandise, or commodity, but solely with respect to having in one's employ eight or more employees, the amount of the tax being based on the amount of the total pay roll.

One can conceive of a case where a person might have in his employ eight employees during each of twenty days, or part of a day, during a taxable year—though not at the same moment of time—but in different calendar weeks, and could not be said to be engaged in any business in so doing. For instance, a physician or a lawyer may decide to construct a house for himself by day labor. In so doing he cannot be said to be engaged in the *business* of building houses or contracting; but simply doing what every person has a natural right to do in the pursuit of happiness and in the exercise of the liberty guaranteed to him under the Fifth Amendment of the Constitution. He employs common laborers, masons, carpenters, plumbers, electricians, painters, steamfitters, and it may well be that during the construction of his home he might find that he has had for one day, or a part of a day—though not at the same moment of time—during twenty weeks, though not even in consecutive weeks—eight employees at work in

constructing his house; and, while it cannot be said that his business is that of house building, under section 907 of title IX (42 U.S.C.A. § 1107) he is subject to the tax imposed under section 901.

It is idle to contend that section 901 of title IX (42 U.S.C.A. § 1101) can be separated from the remainder of title IX and from title III (sections 901 et seq., 301 et seq. [42 U.S.C.A. §§ 1101 et seq., 501 et seq.]) in considering the purpose of Congress in enacting these titles, or that the tax on employers is merely an excise tax for the purpose of raising general revenue. It is obvious that title IX and title III together were intended to compel the states to impose taxes on all employers except those exempt under section 907 (c), in order to provide unemployment compensation within the states which Congress could not do. The federal government then proceeds under section 902 and 903 of title IX (42 U.S.C.A. §§ 1102, 1103) to retain control over the funds, 90 per cent. of which under section 902 may have been imposed under section 901, and impose the conditions under which they may be distributed in the states.

It is urged that the federal act and any state act are entirely independent of each other, but, in the light of the alleged coordinating features of the Act of Congress and the requirements imposed on the state in order to obtain funds for the unemployed in each state, the court cannot shut its eyes to the compelling and regulatory features of the congressional act. Child Labor Tax Case, supra, 259 U.S. 20, at page 37, 42 S.Ct. 449, 450, 66 L.Ed. 817, 21 A.L.R. 1432.

" 'The Constitution, in all its provisions, looks to an indestructible Union, composed of indestructible States.' Every journey to a forbidden end begins with the first step; and the danger of such a step by the federal government in the direction of taking over the powers of the states is that the end of the journey may find the states so despoiled of their powers, or—what may amount to the same thing—so relieved of the responsibilities which possession of the powers necessarily enjoins, as *to reduce them to little more than geographical subdivisions of the national domain.* It is safe to say that if, when the Constitution was under consideration, it had been thought that any such danger lurked behind its plain words, it would never have been ratified." (Italics supplied.)

Carter v. Carter Coal Co., supra, 298 U.S. 238, at page 295, 56 S.Ct. 855, 866, 80 L.Ed. 1160.

It is said that a state is not obliged to pass an unemployment act, and many states have not done so. Neither were employers obliged to comply with the Child Labor Law (40 Stat. 1138, 42 Stat. 306)—they could have paid the tax or penalty—or farmers to reduce their acreage in accordance with the provisions of the Agricultural Adjustment Act (7 U.S.C.A. § 601 et seq.)—they could have refused the aid—but the consequences of failure to do so were such that they could not afford to do otherwise. So in this case, if a state does not pass an unemployment compensation act complying with the requirement of Congress, or of the proper federal bureau, the entire tax assessed on employers under section 901 goes into the United States Treasury. Such a state must itself bear whatever financial burdens result to it from unemployment in its industries. No payments for unemployment assistance are made from the Federal Treasury. A state may not comply at once, but, if the act is held valid, the disadvantages resulting to the state and its employers and the consequent dissatisfaction of its employees, it is quite obvious, will sooner or later compel all the states to enact such legislation, and in such form as will receive the approval of the Social Security Board created by the act. That this amounts to coercion of the states and control by Congress of a matter clearly within the province of the states cannot be denied. If valid, it marks the end of responsible state government in any field in which the United States chooses to take control by the use of its taxing power. If the United States can take control of unemployment insurance and old age assistance by the coercive use of taxation, it can equally take control of education and local health conditions by levying a heavy tax and remitting it in the states which conform their educational system or their health laws to the dictates of a federal board. It is a significant fact that many of the acts in the states provide that the state law shall not remain in effect if title IX is declared unconstitutional, which indicates beyond a doubt that the states in self-defense consider themselves compelled by the act of Congress to enact a state law. It is plainly the duty of the courts to uphold and support the present Constitution until it has been changed in the legal way.

■ While courts will not declare acts of Congress of no effect because some other motive outside the powers of Congress may have actuated Congress in passing it, though not shown on the face of the act, the provisions of an act of Congress must be reasonably adapted to some purpose within the powers vested in Congress and not with a view to accomplishing some other purpose wholly reserved to the states. Linder v. United States, 268 U.S. 5, 17, 45 S.Ct. 446, 448, 69 L.Ed. 819, 39 A.L.R. 229.

■ As to the wisdom, as a social aim, of providing for the unfortunate, the dependent, or those permanently or temporarily unable to earn a livelihood, we are in sympathy; but, even though we may think an act of Congress embodies a commendable social plan and are in sympathy with its purpose and intended results, if its provisions go beyond the limits of federal power and extend into the field of power reserved to the states, we must so declare. Railroad Retirement Board v. Alton R. R. Co., 295 U.S. 330, 347, 55 S.Ct. 758, 761, 79 L.Ed. 1468.

■ However general such social needs may be in the states as sovereign units, they are not necessarily a part of the general welfare of the United States. Schechter Poultry Corp. v. United States, supra; Railroad Retirement Board v. Alton R. R. Co., supra; Carter v. Carter Coal Co., supra, 298 U.S. 238, at pages 290, 291, 56 S.Ct. 855, 863, 864, 80 L.Ed. 1160. If the dual form of our government is to be maintained as conceived by the framers of the Federal Constitution, the general welfare of some or even of all the states *in matters reserved to the states,* when taken together, cannot be held to constitute the general welfare of the United States within the meaning of section 8 of article 1 of the Constitution.

■ Therefore, to provide unemployment benefits regardless of need, to persons who have worked in local employments in local trade and manufacturing within a state, not related to interstate commerce, or in any calling not related to the matters subject to the control of the Congress, is not to provide for the general welfare of the United States.

■ There is no warrant for taking the property or money of an employer and transferring it to his employees without compensation, not even by taxation, Citizens' Savings & Loan Association v. Topeka, 20 Wall. 655, 22 L.Ed. 455, whether

the purpose is a commendable one or not. Title IX, coupled with title III, is an attempt by Congress to impose a tax on employers of eight or more as a means of assuring certain employees, deprived of employment for any reason, of a certain amount of compensation during their period of unemployment, and to regulate the conditions under which such employees shall be entitled to aid.

"A tax, in the general understanding of the term, and as used in the Constitution, signifies an exaction for the support of the government. The word has never been thought to connote the expropriation of money from one group for the benefit of another. * * * The exaction cannot be wrested out of its setting, denominated an excise for raising revenue and legalized by ignoring its purpose as a mere instrumentality for bringing about a desired end. To do this would be to shut our eyes to what all others than we can see and understand." United States v. Butler, supra, 297 U.S. 1, at page 61, 56 S.Ct. 312, 317, 80 L.Ed. 477, 102 A.L.R. 914.

If the act is carried out as planned by Congress, and a tax is imposed on every employer which is credited against a tax imposed by the state, and, under the conditions imposed by section 302 and 303 of title III and section 903 of title IX (42 U.S.C.A. §§ 502, 503, 1103), is paid to employees found to be eligible, it amounts, in effect, to taking the property of every employer for the benefit of a certain class of employees. The entire plan, viewed as a whole, is an attempt to do indirectly what Congress cannot do directly, and to assume national control over a subject clearly within the jurisdiction of the states.

Congress by the provisions of section 903 not only takes charge of the funds raised by the states, but has undertaken to dictate the terms of state legislation in relation to the conditions under which a person is entitled to receive unemployment compensation under a state act.

The federal government has no power, granted or inherent, in respect to the internal affairs of the states. Carter v. Carter Coal Co., supra, 298 U.S. 238, at page 295, 56 S.Ct. 855, 865, 80 L.Ed. 1160. It has no right to say to the several states that, in order to obtain aid for the unemployed in its industries, they must enact statutes which shall provide that:

(1) All unemployment compensation must be paid through public employment

offices in the state or such other agencies as a federal board may approve.

(2) No compensation shall be payable with respect to any day of unemployment occurring within two years after the first day of the first period with respect to which contributions are required.

(3) All money received in the "unemployment fund" (from state taxes) shall immediately upon such receipt be paid over to the Secretary of the Treasury to the credit of the Unemployment Trust Fund established by section 904 of Title IX (42 U.S.C.A. § 1104).

(4) All money withdrawn from the Unemployment Trust Fund by the state agency shall be used solely in the payment of compensation, exclusive of expenses of administration.

(5) Compensation shall not be denied in such state to any otherwise eligible individual for refusing to accept new work under any of the following conditions: (A) If the position offered is vacant due directly to a strike, lockout, or other labor dispute; (B) if the wages, hours, or other conditions of the work offered are substantially less favorable to the individual than those prevailing for similar work in the locality; (C) if as a condition of being employed the individual would be required to join a company union or to resign from or refrain from joining any bona fide labor organization.

Instances are cited of appropriations by Congress for the aid of states in caring for relief of its citizens and in aid of those unable to earn a livelihood, for flood relief in the states, for relief from drought in certain agricultural states, or to relieve losses from earthquakes, here or abroad, or from disastrous fires, and particularly to aid or relieve suffering in other countries, but no special tax was imposed for these. Here the national government is undertaking to impose its will on the several states in regard to one of the oldest and most universal problems in human life: The care of children, of old people, and in aid of the unemployed. In this country it has always been done locally or by the states. Numerous cases can be cited of appropriations made for purposes not within the connotation of the term "general welfare of the United States," but they have never been questioned, and there is no process to prevent an appropriation for such purposes by Congress, as was decided in Massachusetts v. Mellon (Frothingham v. Mellon), 262 U.S. 447, 486, 487, 43 S. Ct. 597, 600, 601, 67 L.Ed. 1078, and in State of Florida v. Mellon, 273 U.S. 12, 18, 47 S.Ct. 265, 266, 71 L.Ed. 511; United States v. Butler, supra, 297 U.S. 1, at page 73, 56 S.Ct. 312, 322, 80 L.Ed. 477, 102 A.L. R. 914. The remedy, if one is necessary, is with the people who select their representatives.

President Cleveland, in 1887, vetoed an attempted act of Congress to aid counties in Texas injured by drought, saying in his veto message:

"I can find no warrant for such an appropriation in the Constitution. The lesson should be constantly enforced that, though the people should support the government, the government should not support the people."

A unanimous court in Schechter Poultry Corp. v. United States, supra, 295 U.S. 495, at page 549, 55 S.Ct. 837, 851, 79 L. Ed. 1570, 97 A.L.R. 947, said that:

"The government also makes the point that efforts to enact state legislation establishing high labor standards have been impeded by the belief that, unless similar action is taken generally, commerce will be diverted from the states adopting such standards, and that this fear of diversion has led to demands for federal legislation on the subject of wages and hours. The apparent implication is that the federal authority under the commerce clause should be deemed to extend to the establishment of rules to govern wages and hours in intrastate trade and industry generally throughout the country, thus overriding the authority of the states to deal with domestic problems arising from labor conditions in their internal commerce.

"It is not the province of the Court to consider the economic advantages or disadvantages of such a centralized system. It is sufficient to say that the Federal Constitution does not provide for it."

As stated above, the issue is not what powers Congress ought to have to meet conditions as viewed by the executive and legislative branches of the government, but what powers are vested in Congress under the Constitution. The Supreme Court through a long series of opinions has defined those powers and the limitations upon them. If the Constitution, as construed through the years, requires amendments to meet new conditions, the way is provided therein.

While state courts have in passing on state unemployment acts held them not to be violative of the constitutional provisions of their respective states, as the Massachusetts Supreme Court in the case of Howe Brothers Company v. Unemployment Compensation Commission, 5 N.E. (2d) 720, has recently decided, it is significant that it did not sustain the taxation provisions of the Massachusetts Unemployment Act as imposing excise taxes, but as an exercise of its police powers, and provided that the state law should not be valid in case the federal act was held to be beyond the constitutional powers of Congress —indicating, we think, that the state acted under coercion.

It seems to be generally agreed the regulation of employment in the states is a matter solely within their jurisdiction. This, we understand, was the basis of the court's decision in the recent minimum wage law of the state of Washington for women; and only in matters where Congress has control, as in interstate commerce or in the District of Columbia, may Congress regulate the wages and hours of labor.

In a case recently decided by the Supreme Court of Canada, Canada Law Reports, 1936, part VII, page 454, approved by the British Privy Council, an act of the Dominion Parliament, relating to social insurance, was held to invade the field exclusively reserved by the constitution to the legislatures of each province; and in the case of James v. Commonwealth of Australia, 1936, A.C. 578, in which an act of the commonwealth of Australia was under consideration to control and limit the products of agriculture, it was held unconstitutional by the British Privy Council. Lord Wright, Master of the Rolls, page 633, in holding the act unconstitutional, said:

"But these inconveniences are liable to flow from a written constitution. Their Lordships cannot arrive at any conclusion save that they could not give effect to the respondents' contention consistent with any construction of the constitution which is in accord with sound principles of interpretation. To give that effect would amount to rewriting, not construing, the constitution. That is not their Lordships' function."

While we accept certain of the premises laid down by the court in the cases of Beeland Wholesale Company v. Harwell G. Davis, Collector of Internal Revenue (C.C.A.) 88 F.(2d) 447 and Charles C. Steward Machine Company v. Davis (C.C.A.) 89 F.(2d) 207, recently decided in the Fifth Circuit, we are unable to adopt its conclusions as to the validity of title IX of the federal act. The case of Gillum v. Johnson et al. (62 P.(2d) 1037, rehearing denied 63 P.(2d) 810) decided by the Supreme Court of California, can hardly be said to have considered, except by way of dicta, the issues raised in the case at bar.

The decree of the District Court is reversed, with costs, and the case is remanded to that court for further proceedings in accordance with this opinion.

BINGHAM, Circuit Judge (dissenting).

This is an appeal from a decree of the District Court for Massachusetts dismissing the plaintiff's bill of complaint. The bill, filed November 6, 1936, was brought by George P. Davis, a citizen of Massachusetts, against the Boston & Maine Railroad, a Massachusetts corporation, praying that the defendant be enjoined from making payments to the Collector of Internal Revenue of the tax imposed upon it under title IX of the Act of Congress of August 14, 1935, c. 531 (49 Stat. 620, U.S.C. title 42, c. 7 [42 U.S.C.A. § 1101 et seq.]), and that title IX of that act be held not to be an act of Congress within its powers under the Constitution of the United States. In the bill it is alleged, and it is conceded, that the plaintiff is a stockholder, owning an unspecified number of shares of stock of the defendant corporation; that the defendant is now, and was during the year 1936, engaged in the business of operating a railroad in Massachusetts, and during that time employed more than eight persons therein; that under section 901 of that act (42 U.S.C.A. § 1101) it is required to pay each calendar year after January 1, 1936, an excise tax; and that the corporation, though requested not to do so, nevertheless had decided to make payments under the act.

It further appears that on November 12, 1936, Guy T. Helvering, Commissioner of Internal Revenue, and William M. Welch, Collector of Internal Revenue for the District of Massachusetts, sought and were permitted to intervene as defendants; that on November 17, 1936, the plaintiff, the defendant, and the interveners filed a stipulation in which it was provided that "The only issue involved in this case, either

directly or indirectly, is whether or not title IX of chapter 531 of August 14, 1935, 49 Stat. 620, is an act of Congress within its powers under the Constitution of the United States, or is violative of the Fifth Amendment thereof, and *the only way that that issue is raised is in respect to payments under that title IX."*

It appears, therefore, that the single question is whether title IX of the act is constitutional in so far as it requires the defendant corporation to make payments of taxes into the Treasury of the United States.

Title IX, the essential provisions of which appear in the footnote of the opinion of the court, is entitled "Tax on Employers of Eight or More," and section 901 (42 U.S.C.A. § 1101), which imposes the tax, reads as follows:

"Section 901. On and after January 1, 1936, every employer (as defined in section 907 [section 1107 of this chapter]) shall pay for each calendar year an excise tax, with respect to having individuals in his employ, equal to the following percentages of the total wages (as defined in section 907 [section 1107 of this chapter]) payable by him (regardless of the time of payment) with respect to employment (as defined in section 907 [section 1107 of this chapter]) during such calendar year."

For the calendar year 1936, the rate is fixed at 1 per centum; for the calendar year 1937, 2 per centum; and after December 31, 1937, 3 per centum.

By section 907 (42 U.S.C.A. § 1107), the term "employer" as used in section 901 means any person (individual or otherwise, section 1101 (3) (4), 42 U.S.C.A. § 1301 (3, 4) employing eight or more persons during the taxable year for the length of time there specified; that the term "wages" means cash or cash value of all remuneration paid employees for services rendered; and that the term "employment" means any service *performed within the United States* by an employee for his employer, except agricultural labor, domestic service in a private home, services of an officer or member of a crew of a vessel on navigable waters of the United States, services of a father in the employ of his son, daughter, or wife, or of a child under twenty-one for his father or mother; services performed in the employ of the United States or one of its instrumentalities; or in the employ of a state, or political subdivision thereof, or of a state instrumentality; for services performed for a corporation or organization organized and operated exclusively for religious, charitable, scientific, literary, or educational purposes, or for the prevention of cruelty to children or animals, *no part of the net earnings of which inures to the benefit of any private shareholder or individual.*

It is apparent from a reading of these sections that the subject or activity upon which the tax is imposed for a given calendar year is a person, firm, or corporation, except those above stated, doing business within the United States in which eight or more individuals are employed; that the object of the tax is the act of the employer in having individuals in his employ; and that the tax is at a fixed rate measured by the total wages paid by the employer to those employed. It is also reasonably certain that the business of the employer, the subject of the tax, is one carried on for profit and not one where no pecuniary benefit accrues to a private shareholder or to an individual. The tax is spoken of in the act as an excise tax.

The plaintiff contends that this is not an excise tax. At one time he argues that no tax is an excise tax except a tax upon property, and then later concedes that such a tax may be one imposed on one's profession or calling, upon the manufacture, sale, use, or consumption of an article; but that it cannot be upon the doing of business or the doing it in a particular mode or form, or upon the act, not the privilege, of carrying on a business employing eight or more employees. He asserts that the tax in question is upon wages—an outgo—and that no one ever heard of a tax upon outgo. He fails to recognize that the tax is not upon the wages, that the wages paid out are merely the measure of the tax, and that the Supreme Court has expressly held that the act of making a gift inter vivos—outgo—may be made the basis of an excise tax upon the donor, measured by the value of the property given (Bromley v. McCaughn, 280 U.S. 124, 50 S.Ct. 46, 74 L.Ed. 226), or upon the act of using a boat, not the privilege of doing so (Billings v. United States, 232 U.S. 261 at page 281, 34 S. Ct. 421, 58 L.Ed. 596). We may therefore reasonably rest assured that, because the tax in question is measured by the wages, *the property paid out,* that it will not for that reason fail of having been properly laid; nor for the reason that the act of the employer in carrying on a business

employing eight or more individuals, not the natural right or privilege of doing so, is made the occasion of the tax.

It is certain that, prior to the adoption of the Sixteenth Amendment, a tax based on the ownership of property, real or personal, and the income derived from either, was a direct tax, and had to be laid according to the rule of apportionment; and that since then a tax upon income, derived from either source, is subject only to being uniform throughout the United States.

The tax here in question is manifestly not a direct tax upon property, and, if it is an indirect tax, an excise, the only constitutional limitation is that it be uniform. Article 1, § 8, cl. 1. It is there provided that "All Duties, Imposts and Excises shall be uniform throughout the United States."

It is also fairly certain that the Supreme Court has held that a tax upon an incidence of ownership of property, which does not amount in fact to a direct tax upon the property itself, may be an excise. It was held, as above said, that a tax on the act of using a boat, an incidence of ownership, even though the use made of it be in foreign waters by a citizen of the United States, permanently domiciled abroad, is an excise within section 8 of article 1. Billings v. United States, 232 U. S. 261, 34 S.Ct. 421, 58 L.Ed. 596. It reached the same conclusion in regard to a tax on carriages which the owner "kept for his own use"—the act of so keeping. Hylton v. United States, 3 Dall. 171, 175, 1 L. Ed. 556. In that case, Chase, Justice, after expressing the view that the power granted to Congress to lay duties, imposts, and excises was the most comprehensive of the powers granted to Congress to lay taxes, other than the one embraced in the "general term tax," said:

"It seems to me, that a tax on *expense* is an indirect tax; and I think, an annual tax on a carriage for the conveyance of persons, is of that kind; because a carriage is a consumable commodity; and such annual tax on it, is on the *expense* of the owner."

In Veazie Bank v. Fenno, 8 Wall. 533, 539, 547, 19 L.Ed. 482, the court had under consideration an act of Congress providing that:

"Every national banking association, State bank, or State banking association, shall pay a tax of ten per centum on the amount of notes of any person, State bank, or State banking association, *used for circulation* and *paid out* by them after the first day of August, eighteen hundred and sixty-six." 14 Stat. 146, § 9.

It will be seen that this act imposed a tax upon the act of paying out the notes of any person, state bank, or state banking association used for circulation; that it was not a tax upon the notes, but upon the use made of them—the act of paying them out, an incidence of ownership.

In that case it was first contended that the tax was a direct tax, and, second, that it was a tax on a franchise granted by the state. It was held not to be a direct tax or a tax on a franchise granted by a state, but was a tax upon the issuance of bank bills under the franchise of the bank; that it stood no differently than a tax upon bills of lading *issued* by a railroad company, in the exercise of its corporate franchise for freight received, which were proper "objects of taxation within the powers of Congress, and not exempted by any relation to the State which granted the charter of the railroad." And in answer to the contention that the tax was "excessive, and so excessive as to indicate a purpose on the part of Congress to destroy the franchise of the bank," the court replied:

"that the judicial cannot prescribe to the legislative departments of the government limitations upon the exercise of its acknowledged powers. The power to tax may be exercised oppressively upon persons, but the responsibility of the legislature is not to the courts, but to the people by whom its members are elected. So if a particular tax bears heavily upon a corporation, or a class of corporations, it cannot, for that reason only, be pronounced contrary to the Constitution."

Like excise taxes imposed upon an incidence of ownership, such as the act of selling liquor or of selling lottery tickets (License Tax Cases, 5 Wall. 462, 18 L.Ed. 497; State of South Carolina v. United States, 199 U.S. 437, 26 S.Ct. 110, 50 L. Ed. 261, 4 Ann.Cas. 737; Ohio v. Helvering, 292 U.S. 360, 54 S.Ct. 725, 78 L.Ed. 1307; United States v. Yuginovich, 256 U.S. 450, 41 S.Ct. 551, 65 L.Ed. 1043); the manufacture, sale or removal for sale of articles (United States v. American Chicle Co., 256 U.S. 446, 41 S.Ct. 548, 65 L.Ed. 1041; Patton v. Brady, 184 U.S. 608, 22 S. Ct. 493, 46 L.Ed. 713); the sale or transfer of securities (Provost v. United States,

269 U.S. 443, 46 S.Ct. 152, 70 L.Ed.. 352; Thomas v. United States, 192 U.S. 363, 24 S.Ct. 305, 48 L.Ed. 481; Treat v. White, 181 U.S. 264; 21 S.Ct. 611, 45 L.Ed. 853); the manufacture and sale of oleomargarine (McCray v. United States, 195 U.S. 27, 24 S.Ct. 769, 49 L.Ed. 78, 1 Ann.Cas. 561); on successions or receipt of property at death (Scholey v. Rew, 23 Wall. 331, 23 L. Ed. 99; Knowlton v. Moore, 178 U.S. 41, 20 S.Ct. 747; 44 L.Ed. 969; New York Trust Co. v. Eisner, 256 U.S. 345, 41 S.Ct. 506, 65 L.Ed. 963, 16 A.L.R. 660); and on the act of making a gift inter vivos, as above stated in Bromley v. McCaughn, 280 U.S. 124, 50 S.Ct. 46, 74 L.Ed. 226.

As taxes laid on such acts have been uniformly sustained as excise taxes under the power of Congress to levy duties, imposts, and excises, it remains to be considered whether it is within the power of Congress to levy such a tax upon the act of doing business, or doing business in a particular manner or form, or on a particular act done in carrying on a business.

In Thomas v. United States, 192 U.S. 363, 24 S.Ct. 305, 306, 48 L.Ed. 481, the appellant had been indicated for violation of the internal revenue laws of.the United States in that, being a broker (doing a brokerage business), he had sold certain shares of stock and omitted affixing the required revenue stamps upon the memorandum of sale. He was found guilty, and, a judgment sentencing him to pay a fine of $500 having been entered, sued out a writ of error. He contended that the right of sale and transfer was a natural or inherent attribute of property or ownership; and that such a natural right could not be made the occasion of a tax. The government contended that it was not a direct tax, but one "in the nature of a duty or excise upon transactions in business activity or forms of commercial dealing"; that "Congress has the power to declare that any person who shall engage in the business or occupation of *buying* or *selling* certificates of stock shall pay a tax measured by the price realized." Chief Justice Fuller in delivering the opinion of the court said:

"The present case involves a stamp tax on a memorandum or contract of sale of a certificate of stock, which plaintiff in error claims was unlawfully exacted because not falling within the class of duties, imposts, and excises, and being, on the contrary, a direct tax on property.

"There is no occasion to attempt to confine the words duties, imposts, and excises to the limits of precise definition. We think that they were used comprehensively to cover customs and excise duties imposed on importation, consumption, manufacture, and sale of certain commodities, privileges, *particular business transactions,* vocations, occupations, and the like.

"Taxes of this sort have been repeatedly sustained by this court, and distinguished from direct taxes under the Constitution. As in Hylton v. United States, 3 Dall. 171, 1 L.Ed. 556, on the use of carriages; in Nicol v. Ames, 173 U.S. 509, 19 S.Ct. 522, 43 L.Ed. 786, on sales at exchanges or boards of trade; in Knowlton v. Moore, 178 U.S. 41, 20 S.Ct. 747, 44 L.Ed. 969, on the transmission of property from the dead to the living; in Treat v. White, 181 U.S. 264, 21 S.Ct. 611, 45 L.Ed. 853, on agreements to sell shares of stock denominated 'calls' by the New York stock brokers; in Patton v. Brady, 184 U.S. 608, 22 S.Ct. 493, 46 L.Ed. 713, on tobacco manufactured for consumption." (Italics supplied.)

And in affirming the judgment of the lower court he stated: "The stamp duty is contingent on the happening of the *event of sale.*" A particular act in the conduct of the business of a broker. And in conclusion said: "As such it falls * * * within the second class of the forms of taxation."

In Spreckels Sugar Refining Co. v. McClain, 192 U.S. 397, 24 S.Ct. 376, 48 L. Ed. 496, the plaintiff below was a Pennsylvania corporation incorporated for the purpose of "refining sugar, which will involve the buying of the raw material therefor, and selling the manufactured products, and of doing whatever else should be incidental to the said business of refining." It sought to recover certain sums paid by it under protest to the defendant-collector, as unlawfully exacted under the twenty-seventh section of the Act of June 13, 1898 (30 Stat. 464). That act imposed a tax upon every person, firm, corporation or company carrying on or doing the business of refining sugar, measured by the gross annual receipts in excess of a named sum. It reads as follows:

"Sec. 27. That every person, firm, corporation, or company carrying on or doing the business of *refining petroleum,* or *refining sugar,* or owning or controlling any pipe line for transporting oil or other products, whose *gross annual* receipts ex-

ceed two hundred and fifty thousand dollars, shall be subject to pay annually a special excise tax equivalent to one-quarter of one per centum on the gross amount of all receipts of such persons, firms, corporations, and companies in their respective business in excess of said sum of two hundred and fifty thousand dollars."

Here, again, the appellant contended that the tax was a direct tax. The government's contention was that it was an excise and plainly indirect; that it made "no difference how the manufacturing activities *are measured* in the imposition of the tax."

It is apparent from a reading of the section that the tax is not based on the doing of business *in corporate form,* for it is imposed upon a person or firm, as well as upon a corporation. It was limited, however, to the doing of business in a particular way, the refining of petroleum or refining of sugar. In holding the tax to be an excise, the court said (at page 411 of 192 U.S., 24 S.Ct. 376, 380, 48 L.Ed. 496):

"Clearly the tax is *not imposed upon gross annual receipts* as *property,* but only in respect of the carrying on or doing the business *of refining sugar.* It cannot be otherwise regarded because of the fact that the amount of the tax *is measured* by the amount of the gross annual receipts. The tax is defined in the act as 'a special excise tax,' and, therefore, it must be assumed, for what it is worth, that Congress had no purpose to exceed its powers under the Constitution, but only to exercise the authority granted to it of laying and collecting excises." (Italics supplied.)

It did not trouble the court in that case that the tax was imposed only on those whose "gross annual receipts exceeded $250,000," and not on other persons, firms or corporations, whose gross annual receipts were less, and who were consequently exempted from payment of the tax. And, after reviewing many decided cases bearing on the question, the court concluded (at pages 412, 413 of 192 U.S., 24 S.Ct. 376, 381, 48 L.Ed. 496):

"We cannot hold that the tax imposed on the plaintiff expressly with reference to its 'carrying on or doing the business of * * * refining sugar,' and which was to be measured by its gross annual receipts in excess of a named sum, is other than is described in the act of Congress,—a special excise tax, and not a direct one to be

apportioned among the states according to their respective numbers. This conclusion is inevitable from the judgments in prior cases, in which the court has dealt with the distinctions, often very difficult to be expressed in words, between taxes that are direct and those which are to be regarded simply as excises. The grounds upon which those judgments were rested need not be restated or re-examined. It would subserve no useful purpose to do so. It must suffice now to say that they clearly negative the idea that the tax here involved is a direct one, to be apportioned among the states according to numbers."

In Flint v. Stone Tracy Co., 220 U.S. 107, 31 S.Ct. 342, 55 L.Ed. 389, Ann.Cas. 1912B, 1312, the question arose under section 38 of the Act of Congress of 1909 (36 Stat. 112), which reads:

"Sec. 38. That every corporation, joint stock company or association, organized for profit and having a capital stock represented by shares, and every insurance company, now or hereafter organized under the laws of the United States or of any State or Territory of the United States or under the Acts of Congress applicable to Alaska or the District of Columbia, or now or hereafter organized under the laws of any foreign country and engaged in business in any State or Territory of the United States or in Alaska or in the District of Columbia, shall *be subject to pay annually a special excise tax* with respect to the *carrying on or doing business by such corporation,* joint stock company or association, or insurance company, equivalent to one per centum upon the entire net income over and above five thousand dollars received by it from all sources during such year, exclusive of amounts received by it as dividends upon stock of other corporations, joint stock companies or associations, or insurance companies, subject to the tax hereby imposed; or if organized under the laws of any foreign country, upon the amount of net income over and above five thousand dollars received by it from business transacted and capital invested within the United States and its Territories, Alaska and the District of Columbia during such year, exclusive of amounts so received by it as dividends upon stock of other corporations, joint stock companies or associations, or insurance companies, subject to the tax hereby imposed: *Provided, however,* That nothing in this section

contained shall apply to *labor, agricultural or horticultural organizations,* or to *fraternal beneficiary societies,* orders, or associations operated under the lodge system, and providing for the payment of life, sick, accident, and other benefits to the members of such societies, orders or associations, and dependents of such members, nor to *domestic building and loan* associations, organized and operated exclusively for the mutual benefit of their members, nor *to any corporation or association organized and operated exclusively for religious,* charitable, or educational purposes, no *part of the net income* of which inures to the *benefit of any private stockholder or individual."* (Italics supplied.)

The second paragraph of this section sets forth what deductions may be made from the gross amount of income to ascertain the net income by which the tax is to be measured.

The third paragraph provides for the deduction of the sum of $5,000 from the net income as determined under the second paragraph, and that the tax shall be computed upon the remainder of such net income for the year ending December 31, 1909, and for each calendar year thereafter, and requires the taxpayer to make a return on or before the 1st day of March, 1910, for the tax of 1909, and a like return on the 1st day of March in each year thereafter.

Here again individuals and partnerships were exempted from paying the tax, as it was not imposed on them. See pages 140, 141 of 220 U.S., 31 S.Ct. 342, 55 L.Ed. 389, Ann.Cas.1912B, 1312.

In construing section 38 for the purpose of ascertaining its meaning, the court said (at page 144 of 220 U.S., 31 S.Ct. 342, 346, 55 L.Ed. 389, Ann.Cas.1912B, 1312):

"A reading of this portion of the statute shows the purpose and design of Congress in its enactment and the subject-matter of its operation. It is at once apparent that its terms embrace corporations and joint stock companies or associations which are organized for profit, and have a capital stock represented by shares. Such joint stock companies, while differing somewhat from corporations, have many of their attributes and enjoy many of their privileges. * * * The tax is to be equivalent to 1 per cent of the entire net income over and above $5,000, received by such corporation or company *from all sources* during the year, excluding, however, amounts received by them as dividends upon stock of other corporations * * * subject to the tax imposed by the statute. * * *

"While the mere declaration contained in a statute that it shall be regarded as a tax of a particular character does not make it such if it is apparent that it cannot be so designated consistently with the meaning and effect of the act, nevertheless the declaration of the lawmaking power is entitled to much weight, and in this statute the intention is expressly declared to impose a special excise tax with respect to the carrying on or doing business by such corporation, joint stock company or association, or company. It is therefore apparent, giving all the words of the statute effect, that the tax is *imposed not upon the franchises of the corporation,* irrespective of *their use* in business, nor upon the property of the corporation, but upon the doing of corporate or insurance business, and with respect to the carrying on thereof, in a sum equivalent to 1 per centum upon the entire net income over and above $5,000 received from all sources during the year; *that is, when imposed in this manner it is a tax upon the doing of business, with the advantages which inhere in the peculiarities of corporate or joint stock organization of the character described.* As the latter organizations share many benefits of corporate organization, it may be described generally as a tax upon the doing of business in a corporate capacity. * * * In other words, the tax is imposed upon the doing of business of the character described, and the measure of the tax is to be the income, with the deductions stated, received not only from property used in business, but from every source. * * * This interpretation of the act, as resting upon the *doing of business,* is sustained by the reasoning in Spreckels Sugar Refining Co. v. McClain, 192 U.S. 397, 24 S.Ct. 376, 48 L. Ed. 496, in which a special tax measured by the gross receipts of the *business of refining oil and sugar* was sustained as an excise in respect to the carrying on or doing of *such business."* (Italics supplied.)

Having ascertained the intention of Congress as expressed in the statute, the court proceeded to consider whether the statute so construed was constitutional, and said:

"It is contended that it is not; certainly so far as the tax is measured by the income of bonds nontaxable under Federal statutes, and municipal and state bonds beyond the Federal power of taxation. And

so of real and personal estates, because as to such estates the tax is direct, and required to be apportioned according to population among the states."

After recounting the provisions of the Constitution relating to the laying of taxes, and restating what was held in the Pollock Case and in Knowlton v. Moore bearing upon this contention, the court said:

"The act now under consideration does not impose direct taxation upon property solely because of its ownership, but the tax is within the class which Congress is authorized to lay and collect under article 1, § 8, clause 1 of the Constitution, and described generally as taxes, duties, imposts, and excises, upon which the limitation is that they shall be uniform throughout the United States.

"Within the category of *indirect taxation*, as we shall have further occasion to show, is embraced a tax upon business done in a corporate capacity, which is the subject-matter of the tax imposed in the act under consideration. The Pollock Case construed the tax there levied as direct, because it was imposed upon property simply because of its ownership. In the present case the tax is not payable unless there be a carrying on or doing of business *in the designated capacity,* and this is made the *occasion* for the tax, measured by the standard prescribed. The difference between the acts is not merely nominal, but rests upon substantial differences between the mere ownership of property and the actual doing of business in a certain way. * * * The tax under consideration, as we have construed the statute, may be described as an excise upon the particular privilege of doing business in a corporate capacity, i. e., with the advantages which arise from corporate or quasi corporate organization." (Italics supplied.)

In discussing the contention that the attempted taxation was void because it taxed franchises which were the creation of the state in its sovereign right and authority, the court said:

"The inquiry in this connection is: How far do the implied limitations upon the taxing power of the United States over objects which would otherwise be legitimate subjects of Federal taxation, withdraw them from the reach of the Federal government in raising revenue, because they are pursued under franchises which are the creation of the states?

"In approaching this subject we must remember that enactments levying taxes, as other laws of the federal government when acting within constitutional authority, are the supreme law of the land. The Constitution contains only two limitations on the right of Congress to levy excise taxes: they must be levied for the public welfare, and are required to be uniform throughout the United States. As Mr. Chief Justice Chase said, speaking for the court in License Tax Cases, 5 Wall. 462, 471, 18 L.Ed. 497, 500: 'Congress cannot tax exports, and it must impose direct taxes by the rule of apportionment, and indirect taxes by the rule of uniformity. Thus limited, and thus only, it reaches every subject and may be exercised at discretion.' The limitations to which the chief justice refers were the only ones imposed in the Constitution upon the taxing power."

The court then took up the inquiry "as to implied limitations upon the exercise of the Federal authority to tax because of the sovereignty of the states over matters within their exclusive jurisdiction, having in view the nature and extent of the power specifically conferred upon Congress by the Constitution of the United States." It said:

"We must remember, too, that the revenues of the United States must be obtained in the same territory, from the same people, and excise taxes must be collected from the same activities, as are also reached by the states in order to support their local government."

And after restating his construction of the statute—that the tax imposed by the act was upon activities connected with doing business in a corporate capacity, activities which arise from and out of the exercise of franchises granted by the state, the court held:

"We think it is the result of the cases heretofore decided in this court, that such business activities, though exercised because of state-created franchises, are not beyond the taxing power of the United States. * * * When the Constitution was framed, the right to lay excise taxes was broadly conferred upon the Congress. At that time very few corporations existed. If the mere fact of state incorporation, extending now to nearly all branches of trade and industry, could withdraw the legitimate objects of Federal taxation from the exercise of the power conferred, the

result would be to exclude the national government from many objects upon which *indirect taxes* could be constitutionally imposed."

It then considered the case of State v. South Carolina v. United States, 199 U.S. 437, 461, 26 S.Ct. 110, 50 L.Ed. 261, 4 Ann.Cas. 737, where it was held that the agents of the state government, carrying on the business of selling liquor under state authority, were liable to pay the internal revenue tax imposed by the federal government and said that the rule to be deduced from that and previous cases was "that the exemption of state agencies and instrumentalities from national taxation was limited to those of a strictly governmental character, and did not extend to those used by the state in carrying on business of a private character"; and that, while federal taxation did not extend to "the means and instrumentalities employed in carrying on the governmental operations of the state," this "limitation has never been extended to the exclusion of the activities of a merely private business from the Federal taxing power, although the power to exercise them is derived from an act of incorporation by one of the states."

It then considered the question of whether "this taxation is so unequal and arbitrary in the fact that it taxes a business when carried on by a *corporation,* and *exempts* a similar business when carried on by a *partnership* or *private individual,* as to place it beyond the authority conferred upon Congress." It pointed out that the limitation of uniformity in laying the tax did "not require the equal application of the tax to all *persons* or *corporations* who may come within its operation, but is limited to geographical uniformity throughout the United States" and held:

"In levying excise taxes the most ample authority has been recognized from the beginning to select some and omit other possible subjects of taxation, to select one calling and omit another, to tax one class of property and to forbear to tax another."

And, in support of the proposition, refers to many cases cited in the margin.

Later the court considered the question whether the *measure* of the tax by the net income of a corporation or company received by it *from all sources* was so arbitrary and baseless as to fall outside the authority of the taxing power. As to this it said (at pages 165–167 of 220 U.S., 31

S.Ct. 342, 355, 55 L.Ed. 389, Ann.Cas. 1912B, 1312):

"The tax must be measured by some standard, and none can be chosen which will operate with absolute justice and equality upon all corporations. Some corporations do a large business upon a small amount of capital; others with a small business may have a large capital. * * * There is no rule which permits a court to say that the measure of a tax for the privilege of doing business, where income from property is the basis, must be limited to that derived from property which may be strictly said to be actively used in the business. Departures from that rule, sustained in this court, are not wanting. In United States v. Singer, 15 Wall. 111, 21 L.Ed. 49, an excise tax was sustained upon the liquor business, which was fixed by the payment of an amount not less than 80 per cent of the total capacity of the distillery. Whether such capacity was used in the business was a matter of indifference, and this court said of such a measure: 'Everyone is advised in advance of the amount he will be required to pay if he enters into the business of distilling spirits, and every distiller must know the producing capacity of his distillery. If he fail under these circumstances to produce the amount for which, by the law, he will in any event be taxed if he undertakes to distill at all, he is not entitled to much consideration.' * * * We must not forget that the *right* to *select the measure* and *objects of taxation* devolves upon the Congress, and not upon the courts, and such selections are valid unless constitutional limitations are overstepped. 'It is no part of the function of a court to inquire into the reasonableness of the excise, either as respects the amount or the property upon which it is imposed.'"

It seems to me that the foregoing decisions demonstrate that the act of doing business, or of doing business in a particular way or form, may be selected by Congress as a proper object for laying an excise tax; and that the act of employing individuals in a business or occupation may likewise be a proper object for an excise tax. And it also seems to me that an excise tax, in the instances mentioned, may properly be measured by the gross or net income of the business, or by the gross or net income from all sources, or by outgo; or by any other standard having relation to the object of the tax and by which the tax may reasonably be measured, as

was done in the Singer Case, where the excise upon the business of distilling liquor was measured by an amount not less than 80 per centum of the total capacity of the distillery, whether that capacity was availed of or not.

The decisions of the Massachusetts court, construing the term "commodity" in the Constitution of that state and relied upon in the opinion of the court in this case, furnish no aid in the construction of article 1, section 8, clause 1, of the Federal Constitution, and the determination of the requisites of an excise tax thereunder, for the word "commodity," as respects an occupation or business, is construed as limited to an occupation of business receiving governmental aid, or to such a one "as to properly call for governmental regulation." No such limitation has been placed by the Supreme Court in article 1, § 8, cl. 1. See the Spreckels Case, supra.

While the power of Congress to select the occasion or object of the tax and the method of measurement is discretionary, its power to select the *subjects* of taxation are apparently limited by the Constitution. Under its requirements Congress cannot select as the subject of taxation the activities of a state, or its instrumentalities, of a governmental nature, but unquestionably has the right to select the business of an individual or a firm, or a corporate organization; and Congress in the selection of the subjects of taxation under title IX did not exceed its power, for it expressly excluded the business activities of a state and its instrumentalities, whether of a private or governmental character; and it seems to be generally conceded that when Congress, in the laying of a tax, has acted within its constitutional authority in the selection of a given subject of taxation, "the taxing power conferred by the Constitution knows no limits except those expressly stated in that instrument"—apportionment in the case of a direct tax, and uniformity for an indirect one; and that, if a tax be within its lawful power, the exercise of that power may not be judicially restrained because it may indirectly affect a power reserved to the states and tend to regulate or suppress a local activity, as in McCray v. United States, 195 U.S. 27, 24 S.Ct. 769, 49 L.Ed. 78, 1 Ann.Cas. 561, where it indirectly tended to regulate and suppress a local activity—the manufacture of colored oleomargarine—a matter of state control; or as in Knowlton v. Moore, 178 U.S. 41, 20 S.Ct. 747, 44 L.Ed.

969, the transmission or receipt of property on the occasion of death—the right to regulate which is likewise within the exclusive control of a state.

In the former case it was said (at page 60 of 195 U.S., 24 S.Ct. 769, 778, 49 L.Ed. 78, 1 Ann.Cas. 561):

"'This principle is pertinent only when there is no power to tax a *particular subject,* and has no relation to a case where such right exists. In other words, the power to destroy, which may be the consequence of taxation, is a reason why the right to tax should be confined to *subjects* which may be lawfully embraced therein, even although it happens that in some particular instance no great harm may be caused by the exercise of the taxing authority as to a subject which is beyond its scope. But this reasoning has no application to a lawful tax, for if it had there would be an end of all taxation; that is to say, if a lawful tax can be defeated because the power which is manifested by its imposition may, when further exercised, be destructive, it would follow that every lawful tax would become unlawful, and therefore no taxation whatever could be levied.'"

See also, Nigro v. United States, 276 U.S. 332, 48 S.Ct. 388, 72 L.Ed. 600, where a lawful tax, which tended indirectly to effect a regulation of a reserved power of a state, was upheld.

And in the McCray Case, at pages 58, 59 of 195 U.S., 24 S.Ct. 769, 49 L.Ed. 78, 1 Ann.Cas. 561 it was held that, where the activity selected by Congress for taxation was a lawful subject, its power to tax was unlimited and its motive or purpose (to suppress or regulate) could not be inquired into by the courts.

As to the power of the courts in this respect, the court said (at page 55 of 195 U. S., 24 S.Ct. 769, 776, 49 L.Ed. 78, 1 Ann. Cas. 561):

"It is, of course, true, as suggested, that if there be no authority in the judiciary to restrain a lawful exercise of power by another department of the government, where a wrong motive or purpose has impelled to the exertion of the power, that abuses of a power conferred may be *temporarily effectual.* The remedy for this, however, lies, not in the abuse by the judicial authority of its functions, but in the people, upon whom, after all, under our institutions, reliance must be placed for the *correction of abuses committed in the exercise of a lawful power."* (Italics supplied.)

And, in the same connection, it was said (at pages 54, 55 of 195 U.S., 24 S.Ct. 769, 776, 49 L.Ed. 78, 1 Ann.Cas. 561) that the contention "that, because a particular department of the government may exert its lawful powers with the *object* or *motive* of reaching an end not justified, therefore it becomes the duy of the judiciary to restrain the exercise of a lawful power wherever it seems to the judicial mind that such lawful power has been abused * * * reduces itself to the contention that, under our constitutional system, the abuse by one department of the government of its lawful powers is to be corrected by the abuse of its powers by another department," that "the proposition, if sustained, would destroy all distinction between the powers of the respective departments of the government, would put an end to that confidence and respect for each other which was the purpose of the Constitution to uphold, and would thus be full of danger to the permanence of our institutions."

In considering the effect of the due process clause of the Fifth Amendment upon a lawful exercise of the taxing power, though indirectly tending to regulate or suppress a local activity, the court said:

"That provision, as we have previously said, does not withdraw or expressly limit the grant of power to tax conferred upon Congress by the Constitution. From this it follows, as we have also previously declared, that the judiciary is without authority to avoid an act of Congress exerting the taxing power, even in a case where, to the judicial mind, it seems that Congress had, in putting such power in motion, abused its lawful authority by levying a tax which was unwise or oppressive, or the result of the enforcement of which might be to *indirectly affect subjects not within the powers* delegated *to Congress.*"

It is certain that the uniformity clause is complied with. That clause exacts only a geographical uniformity, and there is no semblance of ground for claiming a violation of that requirement. Knowlton v. Moore, 178 U.S. 41, 20 S.Ct. 747, 44 L.Ed. 969; Patton v. Brady, 184 U.S. 608, 622, 22 S.Ct. 493, 46 L.Ed. 713; Billings v. United States, 232 U.S. 261, 281, 34 S.Ct. 421, 58 L.Ed. 596; Brushaber v. Union Pacific R. R., 240 U.S. 1, 24, 36 S.Ct. 236, 60 L.Ed. 493, L.R.A.1917D, 414, Ann.Cas. 1917B, 713.

The acts of Congress imposing an excise tax on the business activities of corporations, but exempting like business activities of a *partnership or private individual,* have been held within the authority of Congress. Flint v. Stone Tracy Co., 220 U.S. 107, at page 158, 31 S.Ct. 342, 55 L.Ed. 389, Ann.Cas.1912B, 1312. It is there said:

"In levying excise taxes the most ample authority has been recognized from the beginning to select some and omit other possible subjects of taxation, to select one calling and omit another, to tax one class of property and to forbear to tax another."

See pages 140, 141 of that case in 220 U.S., 31 S.Ct. 342, 352, 55 L.Ed. 389, Ann. Cas.1912B, 1312.

I do not think that Congress rendered its exercise of the taxing power illegal by reason of the exemptions stated in title IX, or by omitting to tax business activities employing less than eight individuals. Quong Wing v. Kirkendell, 223 U.S. 59, 32 S.Ct. 192, 56 L.Ed. 350; State Board of Tax Commissioners v. Jackson, 283 U.S. 527, 537, 539, 51 S.Ct. 540, 543, 75 L.Ed. 1248, 73 A.L.R. 1464.

One would gather from reading the opinion of the court in this case that, on collection of the tax, title IX at once appropriated it to the payment of unemployment benefits under the compensation laws of the states; that what it authorized was the taking of the property of the taxpayer —employer—and turning it over to his employees. But, there is not a word in title IX providing for any such disposition. On the contrary, title IX (section 905 (a), 42 U.S.C.A. § 1105 (a) explicitly provides for the collection of the tax by the Bureau of Internal Revenue and its payment as general revenue into the Treasury of the United States.

It is asserted that title IX is not a revenue measure; that it does not provide revenue with which the United States may pay its debts and provide for the general welfare of the nation. But, as heretofore pointed out, the tax imposed by section 901 (42 U.S.C.A. § 1101) has all the indicia of a validly laid excise. It is to be collected by the Bureau of Internal Revenue the same as all internal revenue taxes are, and paid into the Treasury of the United States "as internal revenue collections"; and in section 905 (b), 42 U.S.C.A. § 1105 (b), the taxpayer is required each year to make a return under oath of his tax and file it with the collector. Title IX makes no provision for the expenditure of a penny of

the tax. On its face, then, title IX discloses that it is a revenue measure, and we are informed that it will in fact bring into the Treasury the first year of its enforcement millions of dollars, and increasing millions each year thereafter. It cannot, therefore, be claimed that title IX is a subterfuge and not a revenue producer.

In Nigro v. United States, 276 U.S. 332, 353, 48 S.Ct. 388, 394, 72 L.Ed. 600, a like contention was made in regard to the Anti-Narcotic Act after its amendment in 1919, in the Revenue Act of 1918 (see 26 U. S.C.A. §§ 1040–1051, 1053, 1383–1391). That amendment had increased the tax imposed under section 1 of the original act (38 Stat. 785), so that the income from the tax became "substantial." It mounted "to about one million a year." In view of this, the court said:

"If there was doubt as to the character of this act as an alleged subterfuge, it has been removed by the change whereby what was a nominal tax before was made a substantial one. It is certainly a taxing act now as we held in the Alston Case [274 U.S. 289, 47 S.Ct. 634, 71 L.Ed. 1052]."

The contention that title IX is not a revenue measure is without foundation. It clearly is such, and will produce millions of dollars for the Treasury. "Taxation may run pari passu with expenditure." Patton v. Brady, 184 U.S. 612, 620, 22 S.Ct. 493, 497, 46 L.Ed. 713. The expenditures of the government for a number of years now have exceeded its revenues, and it is common knowledge that its budget for a like period has been and still is unbalanced. It cannot be said that the government was without need of revenue when title IX was enacted.

The activity selected as the subject of the tax being lawful, the tax being clearly an excise, and a revenue measure, as disclosed on the face of the act (title IX) imposing it, and being such in fact and not a subterfuge—it cannot be declared unconstitutional even though it may indirectly affect a reserved power of a state.

The Child Labor Tax Case, 259 U.S. 20, 42 S.Ct. 449, 66 L.Ed. 817, 21 A.L.R. 1432, is without application to the facts in this case. The provision of the act there considered was section 1200 of Title XII of the Act of Congress entitled "Tax on Employment of Child Labor," 40 Stat. 1138, and reads as follows:

"Sec. 1200. That every person (other than a bona fide boys' or girls' canning club recognized by the Agricultural Department of a State and of the United States) operating (a) any mine or quarry situated in the United States in which children under the age of sixteen years *have been employed or permitted to work* during any *portion* of the taxable year; or (b) any mill, cannery, workshop, factory, or manufacturing establishment situated in the United States in which children under the age of fourteen years *have been employed* or *permitted to work,* or children between the ages of fourteen and sixteen have been *employed or permitted to work* more than eight hours in any day or more than six days in any week, or after the hour of seven o'clock post meridian, or before the hour of six o'clock ante meridian, during any portion of the taxable year, *shall pay* for each taxable year, in addition to all other taxes imposed by law, an *excise tax* equivalent to *10 per centum* of the *entire net profits* received or accrued for such year from the sale or disposition of the product of such mine, quarry, mill, cannery, workshop, factory, or manufacturing establishment."

Under this statute, the subjects of the tax are (1) persons operating a mine or quarry employing therein children under sixteen years of age; (2) persons operating a mill, cannery, workshop, factory, or manufacturing establishment employing children under fourteen years of age; and (3) persons operating the latter activities employing children between fourteen and sixteen years of age more than eight hours a day or six days in the week, or after 7 o'clock at night or before 6 o'clock in the morning, any portion of a year.

And the objects of the tax were the acts of employing children in the different activities in violation of the regulations there stated.

The measure of the tax was 10 per centum of the entire net profits received or accrued for such year from the sale of products of any of the activities mentioned.

In that statute, the acts made the object or occasion of the tax were in themselves direct regulations of the employer's business, in a detailed and specified manner, pertaining to matters reserved exclusively to the states, not mere aids to the collection of the tax.

In construing the law to ascertain its meaning from the language of the act, the court said (at page 36 of 259 U.S., 42 S.Ct. 449, 450, 66 L.Ed. 817, 21 A.L.R. 1432):

"Does this law impose a tax with *only that incidental restraint* and *regulation* which a tax must *inevitably involve?* Or does it *regulate* by the use of the so-called tax as *a penalty? If a tax,* it is *clearly an excise.* If it were an excise on a commodity or other thing of value, we might not be permitted under previous decisions of this court to infer *solely* from *its heavy burden* that the act intends a *prohibition* instead of a *tax.* But this act is more. It provides a heavy exaction *for a departure* from a *detailed* and *specified course* of *conduct* in *business. That course of business is* that employers *shall employ* in mines and quarries, children of an age *greater than 16 years;* in mills and factories, children of an age greater *than 14 years,* and shall *prevent children* of less *than 16 years* in mills and factories *from working more* than *8 hours a day* or *6 days in the week.* If an employer *departs* from this prescribed *course of business,* he is to pay to the government one-tenth *of his entire net income* in the business for a full year. The amount is not to be *proportioned* in any degree to the extent or frequency of the departures, but is to be paid by the employer in full measure whether he employs 500 children for a year, or *employs only one for a day.* Moreover, if he *does not know* the child is within the named age limit, he is not to pay; that is to say, it is only where he knowingly departs from the prescribed course that payment is to be exacted. Scienters are associated with penalties, not with taxes. The employer's *factory* is to be *subject to inspection* at any time not only by the taxing officers of the Treasury, the Department normally charged with the collection of taxes, but also by the Secretary of Labor and his subordinates, whose normal function is the advancement and protection of the welfare of the workers. In the light of these features of the act, a court must be blind not to see that the so-called tax is imposed *to stop the employment of children* within the age limits prescribed. Its prohibitory and regulatory effect and purpose are palpable. * * * Out of a proper respect for the acts of a co-ordinate branch of the government, this court has gone far to sustain taxing acts as such, even though there has been ground *for suspecting,* from the weight of the tax, it was intended to destroy its subject. But in the act before us the presumption of validity cannot prevail, because the proof of the contrary is found *on the very face* of *its provisions.* * * * Taxes are occasionally imposed on the discretion of the Legislature on *proper subjects* with the *primary motive* of *obtaining revenue* from them and with the *incidental motive* of discouraging them by making their continuance onerous. They do not lose their character as taxes because of the incidental motive. But there comes a time in the extension of the penalizing features of the so-called tax when it loses its character as such and becomes a mere penalty, with the characteristics of regulation and punishment. Such is the case in the *law* before us." (Italics supplied.)

Throughout the opinion in the above case, the court was particular to keep in mind the difference between a statute imposing an excise tax upon a subject properly taxable, and having merely an incidental tendency to regulate or suppress a matter within state control, and one which on its face disclosed that its direct and sole purpose was to regulate a matter of state concern, and to penalize any departure from the regulations. But the language of title IX is not on its face reasonably capable of a construction that its sole and direct purpose was to regulate a matter of state concern and to penalize any departure therefrom, and not to provide revenue for the Treasury of the United States.

The Child Labor Tax Case and kindred cases are a far cry from the one now before us. The tax here in question is certainly an excise; the tax provisions of title IX disclose on their face that the tax is levied to provide general revenue to defray the expenses of government; that the tax is collected and paid into the Treasury of the United States as general revenue, with all the attendant circumstances commonly provided for the collection of any tax; that not a penny of it is set apart for any particular purpose, either before or after it reaches the Treasury; and that in fact it will produce millions of dollars of revenue, and therefore is a revenue tax.

The opinion of the court in this case, in substance and effect, takes the position that, if the tax is an excise, if it is a revenue producing measure, and if its proceeds are paid as general revenue into the Treasury of the United States, without being

appropriated to any specific purpose, either before or after it reaches there, and although these things are so, the court may inquire into the purpose and motive of Congress in laying the tax, and, if it can discover that the tax tends indirectly to regulate the taxpayer's business, it may declare the tax provisions unconstitutional, even though title IX is on its face and in fact a tax revenue producing measure. This, according to the decisions of the Supreme Court herein referred to, it cannot do. This was conceded in the Child Labor Tax Case, and was so held in the opinions of the Supreme Court in the McCray and Knowlton Cases, supra, by Mr. Justice White. See, also, A. Magnano Co. v. Hamilton, 292 U.S. 40, 44, 45, 54 S.Ct. 599, 601, 78 L.Ed. 1109. A like holding was recently had in a unanimous decision of the Supreme Court in the case of Sonzinsky v. United States (U.S.) 57 S.Ct. 554, 555, 81 L.Ed. ——, decided March 29, 1937, where the court had under consideration the National Fire Arms Act of 1934, 48 Stat. 1236 (26 U.S.C.A. §§ 1132–1132q), requiring dealers to register with the Collector of Internal Revenue and pay a special tax of $200 a year. Sonzinsky was convicted of dealing in firearms without having paid the tax, and contended that the act "merely pretends to be a revenue measure and is, in reality, a police measure." In that case, it was said:

"Every tax is in some measure regulatory. To some extent it interposes an economic impediment to the activity taxed as compared with others not taxed. But a tax is not any the less a tax because it has a regulatory effect."

In other words, it was a valid tax even though it tended indirectly to regulate the taxpayer's business.

The opinion of this court also takes the position that section 901 of title IX (42 U.S.C.A. § 1101) coerces the states to enact unemployment compensation laws; that the coercion is brought about in this fashion: "A state [not complying, that is, not enacting such a law] must itself bear whatever financial burdens result to it from unemployment in its industries. * * * A state may not comply at once, but if the Act is held valid the disadvantages resulting to the state and its employers and the consequent dissatisfaction of its employees, it is quite obvious, will sooner or later compel all the states to enact such legislation."

In this statement, the court fails to recognize that a state must bear the financial burdens resulting to it from unemployment, irrespective of the tax imposed by title IX upon employers. It also fails to recognize that the tax upon the employer does not impose the burden upon the state of caring for its unemployed. That burden rests upon the state, and always will, whether it enacts an unemployment compensation act or not. There is no compulsion in this. It is free to enact such a law or not as it sees fit. Its employers and the employees may think that the state should enact such a law, but that is not compulsion that results directly or even indirectly from the tax imposed by section 901 of title IX. The most that could possibly be said of it is that, so far as the state is concerned, the result would be indirect and remote, but in such a case it does not lie with the courts to say that the Title imposing the tax was enacted solely to coerce the states to enact unemployment compensation laws. What was said in Massachusetts v. Mellon, 262 U.S. 447, at page 482, 43 S.Ct. 597, 599, 67 L.Ed. 1078, is here applicable: The burden of taxation "falls upon their [the States'] inhabitants, who are within the taxing power of Congress as well as that of the states where they reside"; that "the statute [does not] require the states to do or to yield anything. If Congress enacted it with the ulterior purpose of tempting them to yield, that purpose may be effectively frustrated by the simple expedient of not yielding." The conduct of a state, in the instant case, in enacting an unemployment law, or in refraining from so doing, being voluntary, its decision as to taking either course would seem to present a political question, not one for the courts. Id. 262 U.S. 447, at page 483, 43 S.Ct. 597, 67 L.Ed. 1078. Furthermore, it appears that, in the case of Massachusetts, its unemployment law was enacted before title IX became a law. In view of this, it can hardly be said that Massachusetts was coerced by title IX to enact its law, and did not do so voluntarily.

It is also contended that section 902, the section of title IX (42 U.S.C.A. § 1102) allowing the taxpayer a credit on his tax, likewise coerces the states to enact unemployment laws, but this contention stands no differently than the one just considered. It can enact such a law or not as it sees fit, and, having enacted it, it can repeal it at will. The interest of a state, if

any, in the allowance of the credit, is wholly remote.

It is further contended that the allowance of this credit coerces the taxpayer. Wherein it does so I fail to see. He surely is not compelled to take the credit. His freedom of choice is as undeniable as anything can be. He can take it or leave it. If he takes it, he is relieved to a certain extent from paying taxes to two sovereignties on the same activity. It is now a common thing in federal tax laws to allow a credit of a portion of a tax paid to a state upon the same activity, and even to a foreign nation. United Shoe Machinery Corp. v. White, 89 F.(2d) 363, decided by this court April 5, 1937.

It was undoubtedly discretionary with Congress to prescribe the qualifications of the credit it proposed to allow. But, as the parties in this case have stipulated that "the only way" the constitutionality of title IX "is raised is in respect to payments under that Title" of taxes by the defendant into the Treasury of the United States, we are not now concerned with the question of the construction and validity of section 902 allowing the credit.

Title IX is an act of Congress complete in itself. It does not even refer to any other title. Its construction and validity depend upon what is stated within its four corners, not upon any other title. See section 1103 (42 U.S.C.A. § 1303).

The tax should be sustained.